**The STATE of Ohio, Appellee,**

v.

**WILLIAMS, Appellant.**

[Cite as *State v. Williams* (1996), 115 Ohio App.3d 24.]

Court of Appeals of Ohio,
Eleventh District, Trumbull County.

No. 94–T–5121.

Decided Oct. 28, 1996.

*Dennis Watkins*, Trumbull County Prosecuting Attorney, and *Patrick F. McCarthy*, Assistant Prosecuting Attorney, for appellee.

**28**

*Hennenberg & Brown, Michael C. Hennenberg* and *Edwin J. Vargas*, for appellant.

---

*Per Curiam.*

This appeal has been taken from a final judgment of the Trumbull County Court of Common Pleas. Appellant, Jody Williams, seeks the reversal of his conviction on one count of attempted murder, two counts of felonious assault, and three firearm specifications.

Beginning in February 1994, the Warren City Police Department began to receive complaints concerning suspicious behavior at a residence on Parkman Road within the city limits. Upon conducting an initial investigation of the situation, city detectives noted a pattern of suspected drug activity at this residence. Specifically, surveillance of the residence indicated that individuals would enter the house through the back door, stay for a relatively short time, and then leave.

Further investigation into the matter revealed the following facts: (1) the house was occupied by a number of males, two of whom were named Jody and Darrin; (2) the males had possession of certain firearms, including a .44 caliber revolver with a scope; (3) the males were keeping a large bucket of acid inside the residence; and (4) they had barricaded with wire all the windows in the residence.

Before the department could increase the scope of its investigation, the males were evicted from the Parkman residence by its owner. However, approximately one month later, the department began to receive similar complaints concerning a residence on Oak Street within the city limits. Again, surveillance of this residence indicated the same pattern of suspected drug activity which had been noted at the Parkman residence.

Further investigation into this matter established that the male occupants of the Oak residence had the same characteristics as had the Parkman occupants. Information provided to the city detectives by confidential informants indicated the presence within the residence of the same firearms and acid. In addition, the informants stated that the windows and doors had been barricaded with wire in the same manner as in the prior residence.

On March 8, 1994, one of the detectives' informants made two separate purchases of crack cocaine from an occupant of the Oak residence. Both of these purchases were made with funds provided by the detectives.

Because the informant had been inside the Oak residence when the purchases were made, he was able to confirm much of the information as to the occupants.

Based upon this, the detectives were able to obtain a search warrant for the residence on March 10.

The search warrant was executed by officers from both the city police department and the Trumbull County Drug Task Force. Specifically, the "assault" team consisted of seven officers who performed one of two basic functions during the raid.

The first group consisted of three officers whose primary function was to lead the entire team into the residence. These officers were required to wear a ballistic body armor which covered their entire torsos, from their shoulders to their legs. This armor had to be worn over the officers' other clothing, along with a ballistic face mask which covered their entire faces. The outside of the armor was black and did not have any writing indicating that the three men were police officers. However, the officers also wore their badges on chains which hung around their necks and lay on the outside of the armor.

The second group consisted of four officers whose function was to follow the first three officers into the residence after the initial raid had occurred. These officers only wore ballistic vests under their black sweat shirts. In contrast to the outfits of the first three officers, though, the outfits of these officers readily indicated, on both the front and the back, that the men were police officers. In addition, these officers also wore their badges on chains hanging from their necks.

In executing the raid of the Oak residence, the seven-member assault team was supported by four uniformed policemen. The primary function of these officers was to secure the area outside the house once the raid had started.

In planning the raid, the assault team decided that they would try to enter the house immediately after a "buyer" had gone inside. This strategy was adopted because the team believed that, while a buyer was inside, the chances were greater that the back door would not be barred shut. Accordingly, a separate officer was placed at a location where he could signal to the team when someone had entered the residence.

The raid took place at approximately 7:00 p.m. on March 10. Initially, the assault team was stationed in the driveway of the residence located directly beside the subject residence. Upon receiving the signal that someone had entered the residence, the team exited the police van and proceeded to the back door of the residence.

At the time of the raid, three persons were inside the residence: appellant, Chris Miller, and Dorothy Barnes. Barnes was the person who had just entered the house immediately before the raid began.

Once the entire assault team had positioned itself at the back door of the residence, Detective Gary Riggins of the initial group tried to turn the door knob to determine if the door was locked. While he was doing this, Detective Riggins saw appellant draw back the curtain and look out a window in the door. Upon seeing Riggins in the full armor, appellant immediately turned away from the door and began to run through the kitchen and into the living room. In response, Riggins kicked in the door and went into the residence, followed by the other two members of the initial group and at least one member of the second group.

Almost immediately after the officers entered the residence, an exchange of gunfire took place between appellant, Detective Riggins and a second officer. During the course of this exchange, appellant shot Riggins twice, once in the left arm and once in the chest. In addition, one of the bullets fired by appellant went through the kitchen wall and hit Officer Richard Siegel in his lower back. Officer Siegel was a member of the second group and had been stationed outside the back door. Since both Riggins and Siegel were wearing some form of armor protection, neither was fatally wounded.

As part of the exchange, both appellant and Miller were shot. However, as with the two officers, none of their wounds were fatal. The third person in the residence, Barnes, was not injured in the incident.

Based upon the foregoing basic facts, the Trumbull County Grand Jury returned a four-count indictment against appellant. In relation to the shooting of Detective Gary Riggins, the indictment charged appellant with one count of attempted murder, under R.C. 2923.02(A) and 2903.02, and one count of felonious assault, pursuant to R.C. 2903.11(A)(2). As to the shooting of Officer Richard Siegel, the indictment again charged appellant with one count of attempted murder and one count of felonious assault. In addition, each count contained a specification, pursuant to R.C. 2941.141, that appellant had possession of a firearm while he was committing the particular offense.

A jury trial was held from May 27 until June 3, 1994. As his primary defense at trial, appellant maintained that he had acted in self-defense in shooting at Detective Riggins. This affirmative defense was based upon the factual allegation that appellant did not know that the "intruders" were policemen until he had shot Detective Riggins.

As part of its case, the state offered the testimony of six of the seven members of the assault team. Each of these witnesses testified that prior to entering the residence, they had yelled that they were policemen and that they had a search warrant. At least three of these witnesses also testified that they had continued to yell this after initially entering the residence.

As to the shooting itself, Detective Riggins testified as to the following: (1) upon entering the residence, he ran to the living room's entranceway, where he saw appellant standing by a couch and holding the .44 revolver; (2) as soon as appellant saw Riggins, appellant grimaced and fired two shots at him; (3) the first shot missed Riggins, but the second shot hit him in the left arm; (4) upon being hit, Riggins began to fire back at appellant; and (5) appellant then fired a third shot, which hit Riggins in the chest and threw him against the kitchen wall.

The state presented evidence indicating that, besides Detective Riggins, only one other officer shot at appellant until he was subdued. The state's evidence also tended to show that Officer Siegel was hit in the back by a bullet while he was standing outside the back door of the residence.

In testifying on his own behalf, appellant gave the following version of the events: (1) when he looked out the window, appellant only saw one man wearing a mask; (2) based upon this, appellant thought that the man was trying to break into the house; (3) before he could reach the living room, one of the officers fired at him and hit him in the side of his neck; (4) it was at that point that he picked up the gun from the couch and began to fire back; and (5) he did not hear any of the officers identify themselves as policemen until after he had shot Detective Riggins.

In addition to his own testimony, appellant also presented the testimony of Dorothy Barnes, who stated that she had not heard any of the police officers identify themselves as policemen until after the shooting had started. Moreover, an emergency room doctor testified on appellant's behalf that he had treated appellant at the hospital following the incident, and that appellant had been wounded in the side of the neck by a bullet with a trajectory which was more side to side than front to back.

Based upon this evidence, the jury returned a guilty verdict as to both counts of the indictment which pertained to the shooting of Detective Riggins. In relation to the two counts pertaining to the shooting of Officer Siegel, the jury found appellant not guilty of attempted murder, but guilty of felonious assault. The jury also found him guilty of each of the firearm specifications in the three remaining counts.

After overruling appellant's motion for a new trial, the trial court rendered its sentencing judgment. As to the two counts pertaining to Detective Riggins, the court first held that the felonious assault count, along with its firearm specification, would be merged into the attempted murder count. The court then sentenced appellant to an indefinite term of eight to twenty-five years on the count itself, plus three years of actual incarceration on the firearm specification. As to the remaining felonious assault count, the trial court sentenced appellant to a second indefinite term of eight to twenty-five years on the count itself, plus

three years of actual incarceration on the firearm specification. Finally, the court held that both of the indefinite terms and both of the three-year terms on the two specifications would be served consecutively.

In appealing his conviction, appellant has raised the following assignments of error:

"1. The trial court lacked jurisdiction to impose consecutive sentences for firearm specifications where the underlying felonies were part of the same act or transaction.

"2. The trial court erred in entering a judgment of conviction in connection with the felonious assault of Officer Rick Siegel because the offense is an allied offense of similar import.

"3. The trial court erred in admitting as substantive evidence and without limiting instructions State's Exhibit No. One (1), the search warrant and the search warrant affidavit, and State's Exhibit three (3), the transcript of the *ex parte* search warrant hearing.

"4. The trial court erred in not permitting the entire exculpatory statements from Dorothy Barnes' prior recorded statement into evidence.

"5. The trial court erred in not giving the jury a limiting instruction as to the use of prior inconsistent statements made by witness Dorothy Barnes.

"6. The trial court erred in admitting into evidence the prejudicial hearsay testimony of alleged drug trafficking which is prohibited by Evid.R. 801, Evid.R. 802 and Evid.R. 404(B).

"7. The verdicts finding the appellant guilty of attempted murder and felonious assault are against the manifest weight of the evidence."

■ Under his first assignment, appellant submits that the trial court erred in imposing two separate three-year sentences as to the two remaining firearm specifications. He maintains that only one three-year sentence could be imposed upon him because the facts of the case support the conclusion that the attempted murder of Detective Riggins and the felonious assault of Officer Siegel occurred as part of one "transaction." This argument is well taken.

R.C. 2929.71 governs the imposition of a mandatory three-year sentence if the defendant is found guilty of both the firearm specification and the underlying felony. Division (B) of the statute provides that when a defendant is found guilty of multiple felonies and multiple firearm specifications, each of the three-year sentences must be served consecutively with any indefinite terms or life sentences. However, division (B) also provides:

" * * * If any of the felonies were committed as part of the same act or *transaction,* only one three-year term of actual incarceration shall be imposed for those offenses, which three-year term shall be served consecutively with, and prior to, the life sentences or indefinite terms of imprisonment imposed * * *." (Emphasis added.)

As both parties aptly note, the Supreme Court of Ohio has recently promulgated a new test for determining whether multiple felonies occurred within one transaction. In *State v. Wills* (1994), 69 Ohio St.3d 690, 635 N.E.2d 370, the court adopted the test which the Ninth Appellate District used in *State v. Caldwell* (Dec. 4, 1991), Summit App. No. 14720, unreported, 1991 WL 259529. In *Caldwell,* the Ninth Appellate District defined the term "transaction" as "a series of continuous acts bound together by time, space and purpose, and directed toward a single objective." *Id.* at 34.

In *Wills,* the defendant stole two different coats from two different persons who were not together when the thefts occurred. In both instances, the defendant had had possession of a firearm while committing the thefts. In applying the *Caldwell* test to this situation, the *Wills* court concluded that the defendant could be sentenced under both firearm specifications because the thefts had not occurred as part of a series of continuous acts:

"Wills and his cohorts singled out Stone first, surrounded him, pulled out a gun and then under threat of force robbed him. After completing this task they then targeted Thomas, surrounded him, pulled out a gun, and then robbed him." *Wills,* 69 Ohio St.3d at 691, 635 N.E.2d at 371.

Although not expressly stated in the opinion, the fact that the *Wills* court placed such an emphasis upon the location of the two victims supports the inference that, if the victims had been together when the thefts occurred, the court would have held that only one "transaction" had taken place. As to this point, this court notes that, in applying its own test, the Ninth Appellate District has stated that a robber can only be sentenced to one three-year term for robbing several persons at gunpoint when the robberies occurred at one location and at the same time. See *State v. Stallings* (July 13, 1994), Summit App. No. 16437, unreported, at 42, 1994 WL 362108.

Moreover, this court notes that the *Stallings* decision is consistent with our prior precedent on this issue. In *State v. Hughley* (1984), 20 Ohio App.3d 77, 20 OBR 97, 484 N.E.2d 758 the defendant was convicted of twelve counts of aggravated robbery, one count of felonious assault, and thirteen firearm specifications. This conviction had been predicated upon two separate instances in which the defendant had gone into a bar and robbed the bartender and many patrons. The two instances occurred approximately one week apart and at two different bars.

The trial court in *Hughley* sentenced the defendant to thirteen consecutive three-year terms on the firearm specifications. In reversing this aspect of the sentence, this court held that the defendant could only be sentenced to two three-year terms because only two "transactions" had occurred, *i.e.*, even though the defendant had committed multiple felonies each of the two times he went into the bars, the multiple felonies in each instance had occurred as part of a series of continuous acts.

In the instant case, even though Officer Siegel was not in the same location as Detective Riggins when the two of them were shot, the facts of this case are more analogous to the situations cited in *Hughley* and *Stallings* than the facts in *Wills*.

In support of this conclusion, we emphasize that Siegel was shot within moments of the time that Riggins was shot. More important, we note that Siegel was hit by one of the bullets intended for Riggins and which was fired during the confrontation between appellant and Riggins, *i.e.*, the separate injuries to Siegel and Riggins did not occur in two different confrontations, but occurred during the same one. Based upon this, we hold that the facts of this case were sufficient to satisfy the time requirement of the *Wills* and *Caldwell* tests.

As to the space requirement, even though Siegel was not inside the residence when he was shot, we further hold that Siegel was in the same "location" as Riggins because he was close enough to the site of the confrontation to be hit by what was apparently a stray bullet. As to this issue, we again emphasize that Siegel was hit by a bullet which was fired during the confrontation between appellant and Riggins.

Finally, this court notes that the evidence presented at trial supported the inference that Siegel was hit by one of the bullets which appellant had shot at Riggins. Thus, appellant's action in shooting Siegel was committed with the same objective as his action in shooting Riggins, *i.e.*, the objective of repelling Riggins.

Given the foregoing analysis, it follows that the attempted murder of Riggins and felonious assault of Siegel took place within the same "transaction," as that term has been defined in *Wills*. Accordingly, the trial court erred in sentencing appellant on both of the firearm specifications, pursuant to R.C. 2929.71(B).

As part of its argument under this assignment, the state contends that appellant has waived the right to raise this particular issue before this court because he failed to object to the actions of the trial court when the sentence was imposed. The state further asserts that the judgment of the trial court should not be reversed because the trial court's error did not constitute plain error.

As a general proposition, the plain error doctrine can only be invoked to correct errors which, if allowed to stand, would result in a manifest miscarriage of

justice. *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804. In applying this doctrine, the Fourth Appellate District has held that the imposition of multiple three-year sentences when all of the underlying felonies arose from the same transaction constitutes plain error. *State v. Suttles* (Feb. 27, 1995), Hocking App. No. 94CA9, unreported, 1995 WL 89726.

As a direct result of the trial court's error concerning the imposition of two three-year sentences, appellant will be required to serve three additional years. This court concludes that the imposition of such an increase in sentence is inconsistent with the latest Supreme Court ruling on this issue, so that plain error occurs. Thus, since the imposition of multiple sentences on the two firearm specifications constituted plain error, appellant's first assignment has merit.

█ Under his next assignment, appellant again challenges the propriety of the sentence imposed by the trial court. Appellant submits that the two offenses in the instant case, attempted murder and felonious assault, were allied offenses of similar import. Based upon this, appellant maintains that the trial court erred in imposing a sentence as to both of the remaining counts because the facts of the case supported the conclusion that he had a single animus in committing both offenses.

Appellant's argument is predicated upon R.C. 2941.25, which provides:

"(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

"(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them."

█ In interpreting the foregoing statute, the Supreme Court of Ohio has adopted a two-step standard for determining when a criminal defendant can be sentenced for multiple offenses stemming from one criminal act. First, it must be determined whether the multiple offenses are allied offenses of similar import. If a comparison of the elements of the offenses indicates that the elements correspond to the extent that the commission of one offense will result in the commission of the other, the different crimes are allied offenses, and it is necessary to proceed to the second step of the analysis. Under this step, the defendant's criminal act is reviewed to see whether (1) the offenses occurred separately; or (2) the defendant had a separate animus as to each offenses. If

either of the foregoing is found, the defendant can be convicted of both offenses. See *State v. Blankenship* (1988), 38 Ohio St.3d 116, 117, 526 N.E.2d 816, 817.

In relation to the first step, appellant correctly notes that this court has held that, as a general proposition, attempted murder and felonious assault are allied offenses of similar import. See *State v. Paris* (Mar. 23, 1984), Lake App. No. 9–272, unreported, 1984 WL 6288. Moreover, the facts of this case readily show that the two offenses in question were committed separately, in that the act of shooting Officer Siegel was distinct from the acts of shooting Detective Riggins.[1] Thus, the outcome of our analysis will turn upon whether the facts of this case support the conclusion that appellant had a separate animus as to both offenses.

For the purpose of R.C. 2941.25(B), the term "animus" has been defined as the defendant's purpose or immediate motive. *State v. Logan* (1979), 60 Ohio St.2d 126, 131, 14 O.O.3d 373, 376, 397 N.E.2d 1345, 1349.

In applying the foregoing definition to factual scenarios similar to the one in this case, the courts of this state have focused upon whether the defendant had knowledge of the fact that more than one person could be harmed as a result of his actions. For example, in *State v. Miller* (June 15, 1995), Franklin App. No. 94APA10–1458, unreported, 1995 WL 360234, the defendant fired multiple shots at a residence. Although the shots were intended for just one person, two persons were injured. In holding that the defendant could be sentenced on both counts of felonious assault, the Tenth Appellate District noted that the defendant was familiar with the residence and actually knew that several persons lived there.

In reaching conclusions similar to the one in *Miller*, other courts have emphasized that, under Ohio law, a person is responsible for the natural and probable results of his actions. Based upon this, it has been held that when a defendant intentionally fires a gun into a group of individuals, his intent to harm will be extended to each victim, not just the particular individual aimed at by the defendant. See, *e.g.*, *State v. Bailey* (June 11, 1992), Cuyahoga App. No. 60735, unreported, 1992 WL 136478.

In contrast, other courts have held that a separate animus for multiple shootings did not exist when the defendant was not aware of the presence of persons other than the specific individual at which the defendant aimed. In *State v. Cartellone* (1981), 3 Ohio App.3d 145, 3 OBR 163, 444 N.E.2d 68, the defendant fired three shots at a person who was standing outside a house. In concluding

---

1. As an aside, this court emphasizes that the issue of whether appellant committed separate acts in shooting Detective Riggins and Officer Siegel is different from the issue of whether those acts were part of one transaction for gun specification sentencing purposes, as was considered under the first assignment.

that the facts of the case did not support the conclusion that the defendant had a purpose or motive to harm anyone except the person outside the house, the Eighth Appellate District pointed out that no evidence had been presented which indicated that the defendant had been aware of the presence of two other individuals inside the house.

In the instant case, our review of the trial transcript indicates that neither party presented any direct evidence establishing that, at the moment appellant fired the .44 revolver at Detective Riggins, he was aware of the presence and proximity of Officer Siegel or any of the other officers who participated in the raid. In fact, some of the direct evidence could be interpreted to support the opposite finding. For example, the evidence pertaining to the exchange of gun fire indicates that appellant fired his weapon solely at Detective Riggins, even though two persons, Riggins and a second officer, were firing back at him.

Nevertheless, the trial transcript also shows that certain circumstantial evidence was presented from which it could be inferred that appellant was aware of the presence of other officers before the exchange of gunfire took place. Specifically, we note that a total of four officers were able to enter the residence before the shooting began. Moreover, considerable testimony was introduced which tended to prove that these four officers were yelling "police" and "search warrant" repeatedly as they were entering the residence.

As will be discussed under the seventh assignment, one of the critical factual issues in this case concerned whether the police officers identified themselves before the shooting began. In maintaining that he had acted in self-defense in initiating the confrontation with Detective Riggins, appellant presented evidence which tended to prove that the officers did not identify themselves until after the shooting had begun.

By finding appellant guilty of three of the original charges, the jury obviously rejected appellant's self-defense argument and determined, in essence, that the officers had identified themselves as they were entering the residence. Given this result, it can be inferred that appellant was aware of the presence of more than one person because the state's evidence demonstrated that at least four officers were yelling "police" as they were entering the residence. Stated differently, given the commotion which would be created by the four officers as they came in, it can be inferred that appellant heard them and, thus, was aware of their presence when the shooting began.

Pursuant to the foregoing analysis, this court holds that appellant had a separate animus in relation to the felonious assault of Officer Siegel because the finding of the jury only supported the inference that appellant was aware of the presence of more than one person when he fired at Detective Riggins. Accordingly, the trial court did not err in sentencing appellant on both the count of

attempted murder as to Detective Riggins and the count of felonious assault as to Officer Siegel. Appellant's second assignment lacks merit.

As part of its case, the state introduced the following exhibits into evidence: (1) copies of the search warrant and the affidavit upon which the warrant was based and (2) a transcript of the hearing before a municipal court judge in which testimony was presented concerning the basis of the warrant. Under his third assignment, appellant submits that the trial court erred in overruling his objection to the introduction of these items. He primarily contends that the items should have been excluded because they were irrelevant.

As part of its case-in-chief, the state introduced the testimony of various officers concerning the results of their investigation prior to the issuance of the warrant. The primary subject of this testimony pertained to the officers' knowledge of the fact that the occupants of the Oak Street residence had been trafficking in drugs and that they had possession of certain firearms.

A review of the entire trial transcript indicates that the primary purpose of this testimony was to explain to the jury the reasons why the raid had been conducted in a particular manner. For example, the officers' testimony helped to explain why the initial group of officers wore armor suits. This point was important to the state's case because appellant's primary defense was that, when the raid had first started, he had thought that the residence was being broken into by a robber.

While cross-examining one of these officers, appellant's counsel asked a series of questions which were designed to show that the officers had not known many of the cited facts prior to the raid. Specifically, counsel asked if the affidavit supporting the request for the search warrant had cited some of these facts.

In order to rebut the possible inference raised by these questions, the state sought to introduce the search warrant, the underlying affidavit, and the transcript of the hearing on the warrant. These items showed that the officers did have knowledge of the contested facts in requesting the warrant.

In now maintaining that these items should have been excluded from evidence, appellant notes that these items contained statements which indicated that a person named "Jody" was trafficking in drugs from the residence. Appellant contends that these statements constituted incompetent admissions in relation to the specific charges for which he was being tried.

As a general proposition, this court would agree that the references to the name "Jody" should have been excluded because that particular fact was not a competent admission in relation to the issue of whether the nature of the raid was justified. While the fact that someone in the residence was trafficking in drugs was relevant to the justification issue, the exact name of that person was not.

The references to "Jody" could have been excluded from the documents before they were submitted into evidence.

However, the other information contained in the documents was relevant to the justification issue. Like the officers' testimony, these documents tended to show that the officers were justified in believing that the occupants of the residence might be armed and dangerous. The documents also established that the officers were aware of this information prior to the raid.

Moreover, this court concludes that, when the documents at issue are considered in the context of the entire trial, their probative value readily outweighed any prejudice stemming from the references to "Jody." Again, we emphasize that the reason behind the nature of the raid was an important element of the state's case. Thus, it was critical for the state to rehabilitate the testimony of the officers.

In relation to the admissibility of the search warrant and the transcript, this court further notes that both documents contained hearsay statements. However, as will be fully discussed under the sixth assignment, the oral testimony of the officers, which also contained hearsay statements, was still admissible into evidence because the oral testimony was not presented for the truth of the matter asserted, but was admitted only to explain the officers' later actions. Since the existence of the hearsay statements did not render the oral testimony inadmissible, it follows that the two documents were also admissible.

■ Notwithstanding the foregoing analysis, our review of the record indicates that, in allowing the state to present the officers' testimony, the trial court properly instructed the jury on a number of occasions that it could only consider the testimony as it related to the issue of the officers' knowledge. However, the record also shows that the court did not give the instruction in relation to the search warrant and the transcript.

A review of the search warrant and the transcript indicates that both documents had many statements which could possibly have been prejudicial to appellant. For example, the affidavit accompanying the search warrant contained statements indicating that the officers' informant had twice purchased crack cocaine at the Oak residence from a male named "Jodi." Without the cautionary instruction, there is the possibility that the jury might have considered the statements for the truth of the matter asserted, i.e., the jury could have concluded that the statements showed that appellant was a person of bad character who, for that reason alone, was guilty of the charged offenses.

Of course, the oral testimony of the officers contained statements similar to those in the search warrant and the transcript, and the trial court did tell the jury on a number of occasions that it could only consider the testimony for a

limited purpose. However, despite the similarity between the testimony and the documents, we cannot assume that the jury realized on its own that the cautionary instruction as to the testimony was also applicable to the documents.

Given the nature of the statements contained in the search warrant and the affidavit, this court holds that appellant was prejudiced by the failure of the trial court to give a cautionary instruction explaining the limited purpose for which the jury could properly consider the two documents. Accordingly, appellant's third assignment also has merit.

■ After appellant had rested his case, the state presented rebuttal evidence which was designed to show that one of appellant's witnesses had made statements during her testimony which were inconsistent with a prior statement the witness had given to the police immediately after the incident. Under his fourth assignment, appellant submits that the trial court erred in subsequently not allowing him to introduce the entire prior statement into evidence. He contends that, as a result of this ruling, he was not able to show that the particular statement at issue was taken out of context.

The witness in question was Dorothy Barnes, the third person inside the residence when the raid occurred. During her direct examination at trial, Barnes stated that she had not heard any of the officers state that they were police officers when they initially entered the residence. This testimony was consistent with appellant's version of the incident.

During cross-examination, the prosecutor showed Barnes a copy of a statement which she had given to the police following the incident. The prosecutor then asked Barnes to read the following portion of the prior statement:

"Sgt. D: After you heard the door come in, the gentlemen came in, didn't he say police, search warrant.

"Barnes: I think so."

Upon reading this passage, Barnes testified that this copy of her prior statement was incorrect, and that she had not responded to the officer's question in that manner, i.e., Barnes expressly denied that she ever said that the police had identified themselves while entering the residence.

Accordingly, after appellant had rested, the state presented the testimony of the officer who had taken the alleged statement. The officer testified that the copy of the prior statement was correct, and that Barnes had given that answer in response to his question.

In cross-examining the officer on this issue, appellant's counsel sought to question him as to other aspects of the statement Barnes had made during the interview. The trial court granted this motion in part, but expressly denied

counsel the opportunity to question the officer about an aspect of the statement in which Barnes appeared to contradict herself to an extent, *i.e.*, Barnes stated that, while the police were initially coming into the residence, she had not realized that the men were policemen. The court also denied counsel's request that the entire prior statement be introduced into evidence.

In now arguing that the trial court erred in denying his request, appellant cites Evid.R. 106, which provides:

"When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to introduce any other part or any other writing or recorded statement which is otherwise admissible and which ought in fairness to be considered contemporaneously with it."

In interpreting this rule, this court has expressly held that the adverse party is not automatically entitled to have the entire document introduced into evidence simply by requesting it. Instead, before the statement will be introduced, the adverse party has the burden of showing that the additional parts are relevant to the portion which has already been introduced. *State v. Holmes* (1991), 77 Ohio App.3d 582, 602 N.E.2d 1197.

In the instant case, although appellant's counsel moved for the introduction of the entire prior statement, a review of the statement indicates that counsel's attention was focused upon two comments which Barnes made immediately before and immediately after the passage quoted above. In the first comment, Barnes stated to the officer that she felt that it was difficult for her to remember every detail of the incident because she was upset. In the second comment, as was noted previously, Barnes stated that she had not known at the time of the initial entry that the men entering the residence were police officers.

By seeking to question the officer about these comments, appellant's counsel sought to convince the jury that Barnes's response to the officer's question as to whether the policemen had identified themselves had been coaxed by the officer. Stated differently, counsel sought to raise the inference that Barnes had not intended to tell the officer that she had heard the men say they were policemen, but instead had become momentarily confused.

In response to appellant's argument in this assignment, the state contends that the trial court did not err in refusing to allow counsel to question the officer as to the other comments because those comments were not relevant to the part of the entire statement which they introduced. Specifically, the state submits that the part it introduced was only intended to rebut Barnes's claim that she had not responded to the officer's question in the manner set forth in the statement.

While it may be true that, in presenting the rebuttal testimony of the officer, the state only intended to show that its copy of the prior statement was accurate,

it is also clear that the officer's testimony, if believed by the jury, would have the net effect of impeaching Barnes's credibility. As to this point, this court notes that by asking Barnes about her response to the officer's question, the state was attempting to harm her credibility by showing that she had made a prior inconsistent statement. By having the officer testify after Barnes made her denial, the state indirectly achieved its goal of impeaching Barnes.

Barnes's two contradictory comments in the statement as to whether she had realized that the men were policemen were relevant to her response to the officer's question because the comments could be interpreted as showing that Barnes had not intended to answer the question in the manner she did. By showing the inherent inconsistency between the two comments and the response, counsel may have been able to convince the jury that Barnes had been confused when she answered the officer's question. In turn, this could have shown that her prior statement to the police had actually been consistent with her testimony at trial as to whether the policemen had properly identified themselves.

After the trial court had denied in part appellant's motion concerning Barnes's prior statement, appellant's trial counsel still attempted to cross-examine the officer about the two comments. In relation to the first comment, the officer was permitted to testify that Barnes had stated that it was difficult to remember because she was upset. However, as to the second comment, the trial court did not allow the officer to testify that Barnes had stated that she had not realized at the time of the entry that the men were police officers.

In our estimation, the second comment was more important than the first. While the first comment did not contradict, in any respect, Barnes's response to the officer's question, the second comment did, to a certain extent. Without knowledge of the second comment, the jury would assume that Barnes had maintained throughout the entire prior statement that she had heard the police identify themselves.

Finally, we again emphasize that the issue of whether the officers identified themselves in entering the residence was one of the most important factual issues in this case. Besides appellant himself, Barnes was the only other witness who testified that the officers did not identify themselves. Accordingly, any error in relation to this point cannot be deemed harmless.

Pursuant to the foregoing analysis, the trial court erred in not allowing appellant's counsel to cross-examine the officer as to the second comment in the prior statement. In addition, the trial court erred in not allowing the introduction of the entire prior statement for the limited purpose of showing the context of Barnes's response to the officer's question. Thus, appellant's fourth assignment has merit.

■■■ Upon concluding his cross-examination of the state's rebuttal witness, appellant's counsel moved the trial court to instruct the jury that Barnes's response to the officer's question could not be considered for the truth of the matter asserted. Under his fifth assignment, appellant essentially contends that the instruction which was subsequently given by the trial court was insufficient to convey this proposition to the jury.

In granting appellant's motion, the trial court gave the following instruction to the jury: "[T]his rebuttal testimony has been permitted to *primarily* allow you to determine the accuracy of the transcript that this testimony has been about * * *." (Emphasis added.)

In responding to this assignment, the state asserts that the basic gist of appellant's requested instruction was given by the trial court. That is, the state argues that the foregoing instruction was sufficient to tell the jury that it could not consider Barnes's response to the officer's question for the truth of the matter asserted.

Given the trial court's use of the word "primarily" in the instruction, this court cannot agree that the trial court's instruction served the same purpose as the requested instruction. Technically, the instruction left open the possibility that Barnes's response in her prior statement could be considered by the jury as substantive evidence.

■■■ As appellant notes, Evid.R. 801(D)(1)(a) provides that a prior statement of a declarant is not hearsay if (1) the declarant has testified at the trial and is subject to cross-examination, (2) the prior statement is inconsistent with the declarant's trial testimony, and (3) the prior statement was made under oath and was subject to cross-examination. In this case, while Barnes's prior statement to the police was inconsistent with her trial testimony, that statement was not made under oath. Thus, since the prior statement constituted inadmissible hearsay, it could not be considered for the truth of the matter asserted.[2]

Despite the foregoing analysis, we further note, as to this point, that the record before us indicates that appellant never objected to the specific instruction given by the trial court. In the absence of the necessary objection, appellant has waived the right to raise this particular issue on appeal. *State v. Awan* (1986), 22 Ohio St.3d 120, 122, 22 OBR 199, 201–202, 489 N.E.2d 277, 278–279. Moreover, given that the trial court's instruction was correct except for the inclusion of the

---

2. In relation to our discussion under appellant's fourth assignment, this court emphasizes that, if appellant had been permitted to cross-examine the officer as to Barnes's second comment concerning whether she had realized who the policemen were, the trial court would have been required to instruct the jury that it likewise could not consider that testimony for the truth of the matter asserted.

word "primarily," we conclude that this particular error did not rise to the level of plain error. Thus, appellant's fifth assignment is lacking in merit.

As part of its case-in-chief, the state presented the testimony of various officers concerning the information they gathered concerning the Oak Street residence during their preliminary investigation. Under his sixth assignment, appellant submits that this testimony should not have been admitted into evidence because it constituted hearsay.

A review of the trial transcript indicates that the testimony in question was based in part upon information the detectives received from certain informants. However, the transcript also shows that the purpose of this testimony was not to prove the truth of the matter asserted, but merely to explain what the mind-set of the officers had been when they executed the search warrant.

The courts of this state have generally held that testimony concerning the basis or reason for an officer's actions during an investigation is not considered hearsay. See *State v. Easley* (June 13, 1995), Franklin App. No. 95APA01-1, unreported, 1995 WL 360250. This point has been specifically addressed by the Supreme Court of Ohio:

"The testimony at issue was offered to explain the subsequent investigative activities of the witnesses. It was not offered to prove the truth of the matter asserted. It is well established that extrajudicial statements made by an out-of-court declarant are properly admissible to explain the actions of a witness to whom the statement was directed." *State v. Thomas* (1980), 61 Ohio St.2d 223, 232, 15 O.O.3d 234, 239-240, 400 N.E.2d 401, 407-408.

The testimony of the various officers in the instant case was admissible under the foregoing rule. As to this point, we again note that, on a number of occasions, the trial court properly instructed the jury that the testimony in question could not be considered for the truth of the matter asserted. Thus, appellant's sixth assignment is also lacking in merit.

Under his final assignment, appellant contends that the jury verdict as to both the count of attempted murder and the count of felonious assault was against the manifest weight of the evidence. Appellant essentially submits that he should not have been found guilty under either count because the evidence supported the finding that he was acting in self-defense when he fired the .44 revolver at Detective Riggins. In making this argument, appellant maintains that the testimony of his witnesses should have been found to be more credible than the testimony of the state's witnesses.

In order to carry his burden of proof on the affirmative defense of self-defense, a defendant must show "that he was not at fault in causing the affray,

that he had a bona fide belief that he was in imminent danger of great bodily harm or death, and that he did not violate a duty to retreat." *State v. Broadwater* (Mar. 24, 1995), Lake App. No. 94–L–049, unreported, at 8, 1995 WL 243445.

As to whether appellant was at fault in causing the affray, our review of the trial transcript indicates that the parties presented conflicting evidence on this point. In testifying on his own behalf, appellant stated that the first shot in the altercation was fired by the policemen, and that he was shot in the neck while he was running away from them. In contrast, Detective Riggins testified that appellant already had the gun in his hand when he, Riggins, reached the entranceway to the living room. Riggins also stated that appellant fired the first two shots of the altercation.

Thus, the jury's determination concerning who instigated the altercation turned upon its assessment of the witnesses' credibility. In relation to this type of issue, this court has stated on countless occasions that the assessment of credibility lies within the sound discretion of the trier of fact, whose assessment will not be overturned on appeal unless the testimony in question was completely lacking in credibility. *State v. Darroch* (Dec. 10, 1993), Lake App. No. 92–L–104, unreported, 1993 WL 548054.

Upon reviewing the testimony of Detective Riggins, we certainly cannot say that his testimony was so lacking in credibility that the jury "lost its way" in believing it. As to this point, we emphasize that Detective Riggins's testimony was internally consistent, as well as consistent with the testimony of the other officers.

Moreover, our review of the evidence indicates that it was not established that the wound to appellant's neck was inconsistent with the state's version of the altercation. The state presented evidence showing that a second officer also shot at appellant, and that this officer was standing to the side of appellant when he fired.

A similar conflict of evidence existed as to whether appellant had a bona fide belief of imminent danger of great bodily harm. As was noted above, the outcome of this particular issue turned upon the jury's finding as to whether the officers had identified themselves as policemen in entering the residence.

The trial transcript indicates that appellant expressly testified that he did not hear any of the officers state that they were policemen until after the altercation had started. This testimony was corroborated by Dorothy Barnes. On the other hand, at least three of the officers involved in the raid, including Detective Riggins, testified that they shouted that they were policemen both before and after they entered the residence.

Again, our review of the trial transcript does not support the conclusion that the jury abused its discretion in believing the testimony of the officers as to this point.

Taken as a whole, the trial transcript shows that the state presented substantial competent, credible evidence by which the jury could find that each element of both offenses had been established beyond a reasonable doubt. Thus, since the jury verdict as to both counts was not against the manifest weight of the evidence, appellant's final assignment is without merit.

For the reasons set forth under the foregoing discussion, this court concludes that appellant's second, fifth, sixth, and seventh assignments of error are lacking in merit. However, we further conclude that his first, third, and fourth assignments of error have merit. Accordingly, the judgment of the trial court is reversed, and the cause is hereby remanded for a new trial.

*Judgment reversed*
*and cause remanded.*

FORD, P.J., CHRISTLEY and JOSEPH E. MAHONEY, JJ., concur.