OPINION
Defendant-appellant Thomas Hughes appeals from his sentence and conviction for Felonious Assault, Kidnaping and three counts of Rape. Hughes contends that the trial court erred in permitting the search warrant for his residence to be submitted as evidence for the jury to review, and that trial counsel was ineffective for failing to object thereto. He also claims that the trial court incorrectly charged the jury regarding the date of the offense. Hughes contends that the trial court erred by failing to grant his motion for acquittal on the Kidnaping charge. He also contends that the trial court erred by ordering him to submit to blood and saliva testing, and by permitting the jury to return inconsistent verdicts. He also claims that the trial court erred in sentencing. Hughes claims that he was denied effective assistance of counsel. Finally, he complains of prosecutorial misconduct.
The State candidly concedes, and we agree, that the trial court did err in sentencing Hughes by failing to make findings of fact, as required by statute, regarding the necessity of instituting consecutive sentences. The remainder of Hughes's contentions are without merit. Accordingly, the judgment of the trial court is Reversed, and this cause is Remanded for resentencing in accordance with this opinion.
 I
On May 14, 1998, at about 6:00 a.m., Crystal Fitzsimmons was found unconscious and severely beaten in a lot located at York and Second Streets in Dayton. Police found her bra, panties and driver's license on a porch at 33 York Street. Fitzsimmons was taken to Grandview Hospital where she was treated, and a rape examination was conducted. When she regained consciousness, Fitzsimmons informed the police that the attack had not taken place at York Street, but occurred "off of North Main Street."
After her release from the hospital two days later, Fitzsimmons proceeded to search for the place of the attack. She then notified the police that she had been attacked at 46 Medina, the residence of Hughes. Later, she identified Hughes from a photographic array as the perpetrator. She also described the interior of the residence. Fitzsimmons, an admitted prostitute, told the police that she came into contact with Hughes during the night of May 13 and accompanied him to his house in order to have sex. She stated that she needed to earn money to buy crack cocaine and that she had already had two "hits" of crack earlier in the evening. She also stated that when she asked Hughes for money he became violent and forced her to have vaginal, oral and anal intercourse. She also stated that she asked to go the bathroom, but instead went into the bedroom of one of his children to try to awaken someone. The bedroom was empty. Fitzsimmons stated that Hughes then became violent and hit her, knocking her down the stairs and causing her to hit her head on the stairway wall. She stated that she had no memory of what happened after that until she woke up in the hospital.
A search warrant was secured for the premises. During the search, the police photographed stains that they believed to be blood in the bedroom and on the stairwell of the residence. The police also found a Minnie Mouse watch, which Fitzsimmons claimed was hers. Hughes was arrested. After initially denying any contact with Fitzsimmons, Hughes told the police that he had picked her up on East Third Street and that he took her to his residence for sex. However, he claims that this occurred on May 12. According to Hughes, Fitzsimmons was performing oral sex upon him when he caught her trying to steal his wallet. He claims that he slapped her, ended the "sex date," and took her back to East Third Street.
Hughes was indicted on three counts of Rape [oral, anal and vaginal], one count of Felonious Assault, one count of Kidnaping and one count of Aggravated Robbery. He was tried by a jury in September of 1998, and was convicted on all counts except the Aggravated Robbery charge, on which he was acquitted. The trial court sentenced him to a term of eight years to life imprisonment for Felonious Assault, ten years to life for one count of Rape, ten years on the other two counts of Rape, and ten years on the Kidnaping conviction. All of the sentences were ordered to run consecutively. Hughes appeals from his conviction and sentence.
 II
Hughes's First Assignment of Error states as follows:
 THE TRIAL COURT ERRED IN ALLOWING THE INTRODUCTION AND EXAMINATION BY THE JURY OF THE SEARCH WARRANT.
Hughes contends that the trial court erred by admitting into evidence, and permitting the jury to examine, the search warrant for his residence as well as the supporting affidavit. In support, he argues that permitting the jury to view the warrant, which sets forth the basis for a finding of probable cause that he committed the crimes charged, and which was signed by a judge, was highly prejudicial and inflammatory.
We begin by noting that Hughes failed to preserve this matter for review. The record shows that he filed a motion in limine to preclude the introduction of a reference to a prior arrest for Rape contained in the affidavit supporting the warrant. This reference was redacted prior to submission to the jury. He also objected, at trial, to the fact that the documents admitted were not originals, but did not object to the contents of the warrant and the affidavit. Therefore, we must examine the introduction of these documents under the plain error doctrine. "An alleged error `does not constitute a plain error * * * unless, but for the error, the outcome of the trial clearly would have been otherwise.'"State v. Baston (1999), 85 Ohio St.3d 418, 425.
In this case, we conclude that admission of the documents was error. The State did not set forth any reason necessitating the admission; e.g., the documents were necessary to rebut any evidence presented by Hughes.[1] Also, no cautionary instruction was given to the jury regarding the purpose for which the jury could consider the documents. However, we cannot say that the admission of the search warrant and affidavit rises to the level of plain error. Given the totality of the record before us, we conclude that there is sufficient evidence in the record upon which the jury could rely, aside from the documents, in deciding to convict.
The First Assignment of Error is overruled.
 III
Hughes's Second Assignment of Error states:
 THE TRIAL COURT ERRED IN ALLOWING THE CASE TO GO TO THE JURY WITH A MAY 14, 1998 OCCURRENCE DATE.
Hughes contends that the trial court erred by instructing the jury that the offense occurred on or about May 13 or May 14, 1998, despite the fact that the indictment states that the offense occurred "on or about May 14." Hughes contends that the erroneous instruction prejudiced him. In support, he relies on State v.Kinney (1987), 35 Ohio App.3d 84, which he cites for the proposition that the expansion of the alleged dates of the offense results in a manifest miscarriage of justice.
In Kinney, supra, the First District Court of Appeals held that precise dates are generally not an essential element of an offense. Id., paragraph two of the syllabus. Such specificity is "generally irrelevant to preparing a defense." Id., at 87. However, the lack of specificity will "prove fatal to a prosecution where the absence of specifics truly prejudices the accused's ability fairly to defend himself." Id.
In Kinney, the court found that when the State focuses its entire case upon one specific date, the defendant presents an alibi for that specific date, another incident is mentioned during trial, and the trial court originally instructs the jury that it must find that the offense occurred on that date, it is plain error for the trial court to later permit the jury to find that the offense occurred "on or about" that date. Id., at paragraph two of the syllabus.
In the case before us, the testimony of the victim is that her initial contact with Hughes began on the night of May 13 and continued into the morning of May 14. Hughes filed a notice of alibi, and presented evidence of that alibi, for the period from 10:00 p.m. on May 13 until 5:30 a.m. on May 14. The alibi included a telephone conversation with a woman who testified that she was on the phone with Hughes two times; during the night of May 13 for about fifteen minutes around 11:00 p.m., and then for an hour beginning around 11:35 p.m. on May 13 and ending around 12:35 a.m. on the morning of May 14. Therefore, unlike the defendant in Kinney, Hughes's alibi evidence covers the time included in the jury charge. Moreover, we note that Hughes has failed to specify how he was prejudiced by the instruction.
We find that the trial court's instruction to the jury was correct, based upon the evidence presented at trial. We further find that Hughes was not prejudiced by the instruction, since he presented an alibi for the times set forth in the charge. Therefore, we find this assignment of error not well-taken.
The Second Assignment of Error is overruled.
 IV
For his Third Assignment of Error, Hughes argues:
 THE TRIAL COURT ERRED IN FAILING TO GRANT CRIMINAL RULE 29 MOTION FOR ACQUITTAL ON THE KIDNAPING COUNT.
Hughes contends that the trial court erred by denying his motion for acquittal on the charge of Kidnaping. He argues that the State failed to prove all the elements of the crime beyond a reasonable doubt.
Crim.R. 29 permits a court, after the evidence is closed on either side, to order the entry of a judgment of acquittal on an offense if the evidence is insufficient to sustain a conviction for such offense. In determining the "sufficiency" of the evidence to support a criminal conviction, an appellate court must "examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." State v. Jenks
(1991), 61 Ohio St.3d 259, paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id. See also, State v. Judkins (Feb. 26, 1999), Montgomery App. No. 17315, unreported; "[i]n determining whether to sustain a motion for a judgment of acquittal, pursuant to Crim.R. 29, the trial court is required to view the evidence in a light most favorable to the State."
The statutory elements of the offense of Kidnaping for which Hughes was convicted are set forth in R.C. 2905.01(A)(4), which provides in relevant part:
 No person, by force, threat, or deception, * * * by any means, shall * * * restrain the liberty of the other person, for any of the following purposes:
* * *
 (4) To engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will.
R.C. 2907.01(C) defines "sexual activity" as including sexual conduct, sexual contact or both. Sexual conduct includes vaginal intercourse, anal intercourse, and fellatio. R.C. 2907.01(A).
In this case, the victim testified that she went to Hughes's house to engage in sex. She claims that when she asked him for money, Hughes grabbed her foot and told her that she was "not goin' nowhere." She testified that he would not let her leave, and that he made her get undressed. The victim also testified that Hughes then grabbed her and proceeded to have vaginal intercourse with her. She stated that he was restraining her at that point. She also testified that she was afraid of Hughes because he threatened to kill her. The victim testified that Hughes continued to have vaginal intercourse with her for approximately ten to fifteen minutes when he pulled her by the hair and forced her to perform oral sex upon him. Afterwards, Hughes attempted to have anal intercourse, and actually penetrated for a moment. Finally, she testified that Hughes then beat her until she was rendered unconscious.
Furthermore, the record contains evidence which corroborates the victim's claim. The victim's watch was found in Hughes's house. Also, blood was found in the stairwell of Hughes's house, on his children's furniture and the comforter on his bed; places where the victim testified she was raped or beaten. In fact, although the blood on the comforter could not be directly linked to a specific person, there was testimony by a Miami Valley Regional Crime Laboratory Forensic Scientist that the blood was of the same type as both Hughes and the victim.
Based upon the record, we find that the State presented evidence that, although the victim initially went willingly to Hughes's residence, he forcibly restrained her from leaving the premises while he proceeded to engage in sexual conduct with her against her will. Therefore, we find that the State produced evidence upon which the jury could find that it had proved the crime of Kidnaping beyond a reasonable doubt.
The Third Assignment of Error is overruled.
 V
Hughes assigns the following as his Fourth and Fifth Assignments of Error:
 THE TRIAL COURT ERRED BY IMPOSING UPON THE APPELLANT A SENTENCE THAT IS CONTRARY TO LAW.
 THE TRIAL COURT ERRED BY IMPOSING UPON THE APPELLANT CONSECUTIVE SENTENCES WHICH ARE CONTRARY TO LAW.
Hughes contends that the trial court erred by ordering that each sentence imposed run consecutively. He claims that doing so constitutes cruel and unusual punishment, and violates his right to due process and equal protection of law. He also contends that the trial court erred by failing to state its findings in support of the imposition of consecutive sentences.
A review of the termination entry and the record reveals, as the State concedes, that the trial court failed to make any findings of fact in regard to the imposition of consecutive sentences, as required by R.C. 2929.14(E) and R.C.2929.19(B)(2)(c). Therefore, we conclude that the trial court erred in sentencing. This matter will be remanded to the trial court for resentencing.
In its brief, the State argued that this matter should merely be remanded for the making of appropriate findings of fact to support the imposition of consecutive sentences. Although the primary purpose for requiring findings of fact may be to facilitate appellate review, this court well knows that the necessity of reducing a reasoning process to writing not infrequently impacts upon the reasoning process, itself. At argument, the State conceded that the better course would be to remand this case for resentencing.
Given that this case is being remanded for resentencing, we need not address the constitutional issues raised by Hughes. The resolution of these issues may benefit from the trial court's findings of fact.
Hughes's Fourth and Fifth Assignments of Error are sustained in part.
 VI
Hughes's Eighth and Ninth Assignments of Error state:
ERROR WAS COMMITTED BY THE USE OF CONCLUSIONARY TERMS.
 PROSECUTORIAL MISCONDUCT OCCURRED WITH THE REPEATED AND INFLAMMATORY USE OF THE CONCLUSIONARY TERMS "RAPE KIT" AND "SEXUAL ASSAULT EVIDENCE COLLECTION KIT".
Hughes complains about the use of the terms "rape kit" and "sexual assault evidence collection kit." He contends that by repeatedly using these phrases throughout the trial, the State ensured that the jury could have no doubt that a sexual assault or rape had occurred.
No objection was made by defense counsel regarding the use of these terms. Therefore, we may find that this issue is waived on review. Even if the matter were properly preserved for appellate review, we would not find error. According to the Ohio Supreme Court, "[t]he test for prosecutorial misconduct is whether remarks are improper and, if so, whether they prejudicially affected substantial rights of the accused." State v. Lott (1990),51 Ohio St.3d 160, 165.
Hughes refers us to approximately twenty references in the testimony where the use of these phrases is made in regard to the investigation of the offense. It appears from the transcript that the use of these phrases was relevant to the testimony. Specifically, the rape kit and sexual assault kit are standard items used in the investigation of rape and sexual assault cases. In this case, testimony was presented by the hospital nurse who was trained in the use of such items. The nurse testified as to the function of the kits, as well as the specific use of the kits on the victim in this case. Other testimony was provided by the forensic scientist who described the tests performed on the contents of the kits.
From our review of the transcript, we cannot say that the use of these phrases was inflammatory or prejudicial. There were only twenty references to these phrases in a transcript that is four hundred and thirty pages long. Furthermore, it is clear from a review of the transcript that the references were only made as needed during discussion of matters relevant to the investigation of the victim's allegations. We have found no instance where it appeared that the use of these terms was superfluous.
Given that the references to these terms was used only as necessary to discuss relevant investigation evidence, and that the terms appear to be standard "lingo" for the items used in rape and sexual assault investigations, we cannot say that the remarks were improper. Furthermore, the jury was well aware that this case involved charges of Rape; the entire case revolved around these charges. Thus, the use of these phrases should not have swayed the jury any more than the use of the phrases "rape" or "sexual assault" to describe the defendant's alleged conduct, which were clearly not improper. Finally, the testimony indicated that the data collected in these kits, while not capable of excluding Hughes as the culprit, were also not capable of specifically including him as the perpetrator. Therefore, it would appear that despite the use of these phrases, Hughes was somewhat benefitted by the fact that the use of these items did not contribute to the proof against him. Based on the record, we cannot say that the use of these terms resulted in prejudice to Hughes.
Accordingly, the Eighth and Ninth Assignments of Error are overruled.
 VII
Hughes cites the following as his Tenth Assignment of Error:
 PROSECUTORIAL MISCONDUCT OCCURRED IN OPENING STATEMENT WHEN THE PROSECUTOR MADE INFLAMMATORY ALLEGATIONS OF THE FINDING OF BLOOD ON THE WALLS AND FURNITURE.
In this Assignment of Error, Hughes contends that the prosecutor announced that blood was found on the walls and furniture of his residence, but failed to "prove any connexity of this evidence to [him] and/or the alleged victim." He therefore argues that these claims were prejudicial and inflammatory.
In reviewing the record, we note that the prosecutor made the following comments during opening statement:
 The detectives then took pictures of her body. She wrote out a statement. She had already given identification of the man who had done this to her. And so they put together a Search Warrant. And they searched 46 Medina.
 And at that time, they found evidence that had corroborated her statement. And that was, she said this man knocked her down a stairwell and that her head hit the wall. And they found what they believed to be blood on the wall where her head had hit.
 She also said there was a struggle in his bedroom. And in the area where she said the struggle took place, they found what they believed to be blood on that furniture.
We find that the opening statements were supported by the testimony presented at trial. Specifically, the victim testified as to the struggle in the bedroom. She also testified that Hughes threw her down the stairwell and that she hit her head. Next, the investigating officer testified that he found a substance that he believed to be blood in both of those areas. Finally, the Miami Valley Regional Crime Laboratory Forensic Scientist testified that she tested a blood sample on Hughes's bed comforter, and that the sample, while not capable of being matched to either, was the same type as both Hughes and the victim. She also testified that samples of blood from the bedroom and the stairwell were found to be human blood, but that she was not able to collect enough to determine the type of blood.
From our review of the transcript, we find no impropriety in the prosecutor's remarks. The prosecutor's opening remarks were based upon evidence presented at trial, and she was entitled to make the statements.
Hughes's Tenth Assignment of Error is overruled.
 VIII
Hughes's Eleventh Assignment of Error states as follows:
 THE TRIAL COURT ERRED IN ISSUING AN EX PARTE ORDER FROM A REPRESENTED DEFENDANT.
Hughes claims that the trial court issued an ex parte order requiring him to submit to saliva and blood testing without notice or hearing to him despite the fact that he was represented by counsel.
A review of the record reveals that the State filed a motion to test Hughes's blood and saliva on August 11, 1998. The motion was granted on August 17. Defense counsel filed an objection to the test on August 20. The objection merely stated that Hughes objected to providing samples of saliva and blood because he had not yet been provided with, or had an opportunity to review, the rape kit.
We find this argument, insofar as it suggests that the order of testing violated Hughes's right to counsel, to be without merit. Notice of the order for testing was served upon defense counsel, who filed an objection. The order was not secretly issued or concealed from defense counsel.
Moreover, defense counsel's objection was not addressed to the actual taking of the samples, it only addressed the timing of the testing in conjunction with the issue of discovery matters. There is no evidence that the items sought in discovery were not provided. Even if counsel had objected to any testing under any circumstances, a motion to suppress the results could have been filed. In any event, no objection was ever made to the performance of tests upon the specimens once they were collected. Therefore, we need not address this issue for the first time on appeal.
Even had the matter been properly preserved for review, and even if we found that it was error to require Hughes to submit to such testing, we would find no prejudice, since the results of the blood and saliva testing were inconclusive, neither specifically excluding or including Hughes as the perpetrator. Therefore, we find this argument without merit.
Hughes's Eleventh Assignment of Error is overruled.
 IX
Hughes's Twelfth Assignment of Error is as follows:
 THE TRIAL COURT ERRED IN ALLOWING INCONSISTENT VERDICTS TO BE RENDERED.
Hughes claims that the jury verdict finding him not guilty of Aggravated Robbery is inconsistent with the verdicts finding him guilty of Felonious Assault, Rape and Kidnaping.[2] He argues that since the jury did not find him guilty of "the necessary physical violence or threat thereof for [the offense of Aggravated Robbery] how could he be found guilty of using the same force in the other alleged sexual offenses all of which began with consensual sex."
The offense of Aggravated Robbery was charged as a separate count in the indictment. This court has noted that "an inconsistency in a verdict cannot arise out of inconsistent responses to different counts." State v. Washington (1998),126 Ohio App.3d 264, citing State v. Brown (1984), 12 Ohio St.3d 147. "* * *[A]n inconsistency can only arise when the jury gives inconsistent responses to the same count" because "each count in an indictment charges a distinct offense and is independent of all other counts." Washington, at 276. However, while a defendant may not challenge his conviction on the basis of an inconsistency between verdicts on separate counts, he may make a claim that there was insufficient evidence to convict him of the other offenses. Id., at 276-277.
Hughes has failed to raise an insufficiency of the evidence argument in regard to the Rape and Felonious Assault convictions. While, as noted above, the sufficiency of the evidence was raised in regard to the Kidnaping conviction, we have found that argument to be without merit.
In any event, we do not find the verdicts to be inconsistent. In instructing the jury on the offense of Aggravated Robbery, the trial court informed the jurors that they needed to find that Hughes "knowingly obtained property owned by Crystal Fitzsimmons without her consent and for the purpose of depriving her of that property, and that the Defendant inflicted serious physical harm upon Crystal Fitzsimmons." R.C. 2911.01(A)(3) and 2913.02(A)(1). The court further defined "deprive" as "withholding the property of another permanently or for such a period as to appropriate a substantial portion of its value or use; dispose of property so as to make it unlikely that the owner will recover it." R.C.2913.01(C).
The victim testified that when Hughes forced her to undress, he made her remove her watch and even a rubber band in her hair. She also testified that Hughes threw the watch into a corner of the bedroom. We find that a jury could reasonably find that Hughes did not knowingly obtain the watch for the purpose of depriving the victim of the property. Instead, the jury could reasonably find that the watch was merely an incidental item that was lost in the melee, and that it was not removed for theft purposes, but as part of the Rape. In other words, the verdict does not necessarily reject as unproven the element of force necessary for Aggravated Robbery, but may have rejected as unproven the element of purposeful deprivation of property. Therefore, we find that there is no inconsistency between the verdicts for the other offenses in which force was a necessary element, and the verdict acquitting Hughes of Aggravated Robbery.
Hughes's Twelfth Assignment of Error is overruled.
 X
Hughes's Sixth and Seventh Assignments of Error are as follows:
 ERROR WAS COMMITTED BY THE TRIAL COURT WHICH RISES TO THE LEVEL OF PLAIN ERROR.
 APPELLANT WAS DENIED THE CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL.
Hughes contends that the trial court committed numerous errors constituting plain error, and that trial counsel was ineffective because of her failure to object to the errors. Specifically, Hughes contends that error was committed, and counsel was ineffective for failing to object, when: (1) he was ordered to submit to a blood and saliva test; (2) the search warrant was submitted to the jury; (3) ambivalent dates were given regarding the date of the offense; (4) the prosecutor asked leading questions; (5) testimony was given regarding the inconclusive blood tests; (6) the jury returned inconsistent verdicts; and (7) the trial court improperly sentenced Hughes.
As stated above, we conclude that Hughes was not prejudiced by the order requiring him to submit to blood and saliva testing, and that he was not prejudiced by the fact that the tests were inconclusive. We further conclude that the dates provided regarding the offense were not erroneous. We also conclude that the jury did not return inconsistent verdicts. Finally, we have already sustained the assignment of error regarding the sentence imposed, and have remanded that issue. Therefore, we need not address these issues either under a plain error or ineffective assistance of counsel standard.
Likewise, we need not address the claim that the trial court permitted the prosecutor to ask leading questions and that counsel failed to object. Hughes fails to make reference to any leading questions to which he would now object. While we have reviewed the transcript in analyzing this case, our attention was not drawn to particular leading questions, and we are not required to comb the record in search of prejudicial error. Therefore, we reject this claim.
The only issue raised in this assignment of error that we are compelled to address is the question of whether trial counsel was ineffective for failing to object to the submission of the search warrant and its supporting affidavit. In order to demonstrate the ineffective assistance of counsel, Hughes is required to show that trial counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. State v. Bradley (1989),42 Ohio St.3d 136, paragraphs two and three of the syllabus.
At the time of trial, case law existed to suggest that the introduction of search warrants in evidence is permissible. SeeState v. Gray (1979), 60 Ohio App.2d 418, 420-421; State v.Williams (1996), 115 Ohio App.3d 24, 38-40 (admission of search warrant and affidavit admissible under particular facts of case, but failure to give limiting instruction constituted reversible error). Counsel did make an objection regarding the necessity of redacting portions of the affidavit supporting the warrant regarding a prior arrest for Rape, and counsel objected to the fact that the documents were not originals. However, counsel could have objected to the introduction of the documents regardless of whether they were original. Also, counsel could have asked for a cautionary instruction regarding the purpose for which the documents could be considered. Given that there was no stated purpose for the introduction of the documents, and that we can discern no reason in this case for their introduction, we find that counsel's performance did fall below an objective standard of reasonableness.
Although the issue is close, we conclude that Hughes has not shown a reasonable probability that the outcome of the trial would have been different had an appropriate objection been made to the admission of the search warrant and affidavit. The jury was generally instructed concerning its duty to determine, from the evidence presented, whether the State had met its burden of proof beyond reasonable doubt upon the elements of the charged offenses. That the jury took its duty seriously is evident from its acquittal on the charge of Aggravated Robbery. We conclude that it is not likely that the jury deferred to the determination of the judge issuing the search warrant that there was probable cause to believe that Hughes committed the crimes with which the search warrant was concerned.
Hughes's Sixth and Seventh Assignments of Error are overruled.
 XI
Hughes's Fourth and Fifth Assignments of Error having been sustained in part, and his other assignments of error having been overruled, the judgment of the trial court is Reversed, and this cause is Remanded for the limited purpose of re-sentencing Hughes in accordance with this opinion.
WOLFF and KOEHLER, JJ., concur.
(Honorable Richard N. Koehler, Retired from the Twelfth Appellate District, Sitting by Assignment of the Chief Justice of the Supreme Court of Ohio).
Copies mailed to:
George A. Katchmer
William R. Ary
Hon. Michael T. Hall (successor to Hon. James Gilvary, deceased)
[1] In a criminal prosecution in which evidence has been obtained by use of a search warrant, the State may have a legitimate interest in acquainting the jury with the fact that the search was conducted pursuant to a warrant, in order to avoid any possible implication, in the minds of the jurors, that the search was unlawful or unreasonable. This interest can be fully satisfied, however, by asking the testifying police officer whether the search was conducted pursuant to a search warrant, and eliciting an affirmative response. There is no legitimate need to parade the warrant before the jury, with the issuing judge's imprimatur that there is probable cause to believe that the defendant committed the offense and that evidence of the offense can be found at the specified location.
[2] The Aggravated Robbery charge stems from the fact that the victim's Minnie Mouse watch was found by the police in Hughes's residence.