OPINION
{¶ 1} Appellant, Joseph A. Sands, appeals from the Lake County Court of Common Pleas judgment of his conviction and sentence for engaging in a pattern of corrupt activity and attempting to commit murder and aggravated arson with public officials as his targets.
 {¶ 2} As Francis Bacon said, "Revenge is a kind of wild justice, which the more man's nature runs to the more ought law to weed it out." A Lake County jury listened to the revengeful voice of a calculating man outline a chilling plot with his girlfriend and *Page 2 
friend to kill a mayor, a prosecutor, and a judge; all because he was aggrieved by prosecutions for various misdemeanor offenses.
 {¶ 3} Unbeknownst to Mr. Sands, in an effort to stop the plot and weed out the conspirators, Mr. Sands' friend, Mr. Green, became a confidential informant. Over a period of five days he recorded Mr. Sands' detailed plans for the acquisition of materials for the construction of pipe bombs which were to be used to fire bomb officials' homes. The plot had progressed to the point where a dry run for the bombing of the mayor's home was undertaken. When Mr. Green expressed some concern as to any children who would surely be in the mayor's home, Mr. Sands matter-of-factly replied, "[his] kid is going to die with him."
 {¶ 4} The plot was foiled, the conspirators prosecuted, and the rule of law, not the street, prevailed in the jury's verdict. We affirm the jury's verdict for the reasons that follow.
 {¶ 5} Substantive and Procedural History
 {¶ 6} On April 1, 2006, Jason Green contacted Madison Township Detective Mark Parisi and requested that they meet outside of his hometown, North Perry Village. At the meeting, Mr. Green informed him that his friend, Mr. Sands, and Mr. Sands' girlfriend, Dawn Holin, were conspiring to kill four local officials. The intended targets were Painesville Municipal Court Judge Michael Cicconetti, North Perry Police Chief Denise Mercsak, North Perry Mayor Tom Williams, and North Perry Prosecutor Joseph Gurley. *Page 3 
 {¶ 7} Mr. Sands and Mr. Green became friends several years ago when Mr. Green moved next door to JB Performance. They would see each other at least daily, visit each other's homes and of course, hang out at JB Performance.
 {¶ 8} Both Mr. Green and Mr. Sands had an embattled history over the years with the North Perry Village Police and Mayor Williams, and both believed they were being unfairly harassed. There were incidents and altercations where the police would be called to Mr. Sands' automotive repair shop, JB Performance, which he owned with his girlfriend and co-conspirator, Ms. Holin. Mr. Green also had a lengthy criminal history, and faced various charges in the past few years for theft, menacing, animal cruelty, and littering, to name a few among the many. Mr. Green and Mr. Sands purchased a recording device and would record their conversations with the police and the mayor, in the hopes of proving they were being harassed. They also talked of a possible civil suit against the village. In fact, Mr. Green had recorded one such conversation with Officer Rex Buchs, who told him that the police would probably leave him alone if he stopped hanging out with Mr. Sands.
 {¶ 9} In the few months prior to the rise of the conspiracy, Mr. Green, his girlfriend, Janice Dotson, Mr. Sands, and Ms. Holin were prosecuted on various misdemeanor charges. Both Mr. Sands and Ms. Holin were convicted for failing to file income taxes. Mr. Sands served approximately five days in jail, followed by electronically monitored house arrest for ten days. He was then convicted for failure to pay sales tax. This was the sentencing that was pending at the time of his arrest for this conspiracy. His sentencing was set for April 20, 2006, and his idea was that Judge Cicconetti would be intimidated by the deaths of Mayor Williams and Prosecutor Gurley. *Page 4 
Ms. Holin's sentencing was set for April 20, to be followed three days later by Mr. Green's sentencing for the menacing charge. Mr. Green's girlfriend, Ms. Dotson, was facing a barking dog charge.
 {¶ 10} After hearing Mr. Sands lay out this chilling plot, Mr. Green went to the police. Since both Mr. Green and Mr. Sands had been voluntary informants for Detective Parisi in the past, Mr. Green felt he could trust the detective with this information. Mr. Green told the detective that Mr. Sands wanted to kill the victims by building homemade pipe bombs that were going to be loaded with shrapnel and ether, as well as possibly, homemade napalm. The plan was to kill Mayor Williams in the first few weeks of April by throwing a pipe bomb through the bay window of his home. The next target was to be Prosecutor Gurley. Then, after Mr. Sands was sentenced for failing to file his taxes on April 20, they would move on to the judge. By killing Mayor Williams and Prosecutor Gurley, Mr. Sands hoped to intimidate Judge Cicconetti to impose a lesser sentence.
 {¶ 11} Detective Parisi equipped Mr. Green with a recording device to determine the seriousness of the threat. After meeting with Mr. Sands at JB Performance, Mr. Green immediately returned and provided Detective Parisi and Detective Timothy Doyle with a recording of a conversation he had with Mr. Sands, in which the two discussed the plan, the bomb, and possible alibis. Mr. Sands' discussion was very descriptive, detailed and vulgar.
 {¶ 12} With this recording, the threat was deemed serious, and the Federal Bureau of Investigation and the Bureau of Alcohol, Tobacco, Firearms and Explosives were contacted. The FBI provided surveillance of Ms. Holin and Mr. Sands up to the *Page 5 
point of arrest, and wanted to ensure this was not part of a larger domestic terrorist group. They also provided a GPS for Mr. Green's minivan. Likewise, the ATF was concerned from the very nature of the pipe bombs, and two days after the initial contact by Mr. Green, ATF took over the surreptitious recordings for the Madison Police.
 {¶ 13} The intended targets were informed of the threat against them and surveillance was provided until Mr. Sands and Ms. Holin were arrested. Some of the targets and their families left their homes in fear of their lives until the ordeal was over.
 {¶ 14} Mr. Sands devised all facets of the plan. His firebombing target was Mayor Williams. He was adamant that Mr. Green would drive, so he could run and throw the bomb into Mayor Williams' home. At the request of the police, Mr. Green suggested involving a third party, but Mr. Sands did not want anyone else involved. Mr. Sands also developed their alibi that they had gotten drunk and the three just stayed at the Sands/Holins' home. Since their history with the village was notorious, Mr. Sands knew they would be under suspicion. Because of that they would hit Prosecutor Gurley a month after Mayor Williams, and then they would possibly have to wait as long as a year to shoot Judge Cicconetti.
 {¶ 15} Between April 4 and April 9 of 2006, Mr. Green continued to record conversations with Mr. Sands, recording approximately seven conversations. He was directed by the police to "act normal" and to follow Mr. Sands' directions. During the second of two April 4th recordings, Mr. Sands showed Mr. Green a container of gun powder and explained that he was going to build the pipe-bomb out of three-inch galvanized pipe, and attach four cans of ether to it. During this second conversation Mr. Sands and Ms. Holin discussed purchasing more gun powder and a fuse. He also *Page 6 
discussed how to build homemade napalm, which he learned from one of his CB radio acquaintances, Mr. Pongrass. He also inquired over the CB radio where he could purchase gunpowder. Even though it was readily available at hunting and sporting goods stores, he chose to purchase the powder from an acquaintance, Mr. Gau. Per Mr. Sands' direction, Ms. Holin purchased the powder from Mr. Gau.
 {¶ 16} The following day, before a dry-run directed at the mayor's home, Ms. Holin gave Mr. Green a list with Prosecutor Gurley's name and address, as well as the name of the judge, and asked him to locate the judge's address. Mr. Sands and Mr. Green then conducted a "dry-run" of Mayor Williams' home. At some point, Chief Mercsak saw Mr. Sands drive by her home, which she thought was odd since she had never seen him in the area before. North Perry Village is a very small town, about four square miles, with fewer than one thousand residents. She waved to Mr. Sands as he drove about five miles under the speed limit, but according to her, he did not respond. Mr. Sands testified that he drives his bike on that route all the time, and that he was driving to his business or home, and that he did wave back when he saw Chief Mercsak wave.
 {¶ 17} Ms. Holin searched for a shop to buy the pipe after they agreed it would be best to pay in cash at a store that was not in the local area. Mr. Sands and Ms. Holin gave Mr. Green two $50 bills to purchase the galvanized pipe and four end caps. Mr. Green traveled to two different hardware stores in Willoughby with ATF following him in order to document the purchases. Mr. Green drove the items back to JB Performance and stored them in the bay of Mr. Sands' shop. *Page 7 
 {¶ 18} By Friday, April 7, the three had everything they would need with the exception of the wick to light the pipe bomb. To purchase this, Mr. Sands wanted Mr. Green to accompany him to a store some sixty miles away in Ashland, Ohio, called Fin, Fur, Feather. Like the pipe, he did not want to make the purchase in the local area, where everyone seemed to know each other. Ms. Holin provided them with directions. Unbeknownst to Mr. Sands, ATF, the police, and the FBI were following them, with a plan to arrest the pair upon purchase. On the way to Ashland, Mr. Sands told Mr. Green they could not use the pipe they purchased because it was too identifiable. The police could easily discover that Mr. Green had purchased the pipe, thus, Mr. Sands suggested getting some pipe from his brother-in-law.
 {¶ 19} At the store, the two looked at some ammunition, picked up the wick and some 2-way radios. Mr. Sands purchased fifteen feet of wick and a 2-way radio, and Mr. Green purchased a two-way radio as well. When they left the store, both were arrested and placed in separate vehicles. Mr. Green did not know in advance of the plans for arrest.
 {¶ 20} At the time of arrest, Mr. Sands consented to a search of his home and business, which produced all of the equipment needed to make a pipe bomb. The search of his shop produced the now threaded end-caps and the long steel pipe that Mr. Green had purchased, as well as ether. A search of Mr. Sands' home produced a container of smokeless gun powder, as well as large quantities of ammunition, several rifles, shotguns, and handguns. Mr. Sands told the authorities that he did not even know how to make a pipe bomb, although the over seven recorded conversations between him and Mr. Green begged otherwise. He was mirandized, but then waived *Page 8 
his right to remain silent. He claimed that the gunpowder was to reload shotgun shells, although those shells were never found; that the pipe was going to be used to fix his bathroom, although that is not the type of pipe used for plumbing; and that the wick was going to be used to blow up some "varmints."
 {¶ 21} Mr. Sands was subsequently charged with two counts of engaging in a pattern of corrupt activity, first degree felonies in violation of R.C. 2923.32(A)(1); four counts of conspiracy to commit aggravated murder, felonies of the first degree in violation of R.C. 2923.01(A)(1); four counts of conspiracy to commit aggravated arson, felonies of the second degree in violation of R.C. 2909.02(A)(1); and four counts of conspiracy to commit aggravated arson, felonies of the third degree in violation of R.C. 2923.01(A)(2). The counts of aggravated murder and aggravated arson were for each of the four intended targets. During trial, the two counts of engaging in a pattern of corrupt activity were merged.
 {¶ 22} Mr. Sands, in his defense, testified that the plan was Mr. Green's idea and he was merely a cohort. He was, in fact, trying to "control" Mr. Green to prevent him from carrying out the plan.
 {¶ 23} After an almost two week trial, the jury found Mr. Sands guilty on six counts of the indictment, finding him guilty of engaging in a pattern of corrupt activity, three counts of conspiracy to commit aggravated murder as they related to Judge Cicconetti, Mayor Williams, and Prosecutor Gurley; as well as two counts of conspiracy to commit aggravated arson as they related to Mayor Williams and his property. For sentencing purposes, the conspiracy counts were merged as they were part of one single agreement pursuant to R.C. 2923.01(F). Ultimately, the court sentenced Mr. *Page 9 
Sands to ten years on the count of engaging in a pattern of corrupt activity, and ten years on the merged count of conspiracy, to be served consecutively to each other, for a total term of imprisonment of twenty years.
 {¶ 24} Mr. Sands now timely appeals, raising seven assignments of error:
 {¶ 25} "[1.] Pervasive instances of sub-standard representation by Trial Counsel were so serious as to deprive Appellant of a fair trial in violation of the Sixth Amendment to the United States Constitution and Article I, Section 10, of the Ohio Constitution.
 {¶ 26} "[2.] The evidence was insufficient to sustain a conviction on the RICO count in the Indictment.
 {¶ 27} "[3.] Appellant committed no offense prohibited by R.C. 2923.32
which was utilized for an improper purpose by the State of Ohio.
 {¶ 28} "[4.] The Trial Court erred in admitting other acts evidence denying Appellant a fair trial.
 {¶ 29} "[5.] Appellant was penalized for his silence in violation of the rights guaranteed to him by the Fifth and Sixth Amendments to the United States Constitution.
 {¶ 30} "[6.] Victim-impact testimony during the guilt phase of trial was irrelevant and/or prejudicial resulting in the denial of a fair trial.
 {¶ 31} "[7.] The single conspiracy offense and the RICO count were allied offenses of similar import."
 {¶ 32} Ineffective Assistance of Counsel
 {¶ 33} In his first assignment of error, Mr. Sands argues that he was deprived of the effective assistance of counsel, arguing that there were "pervasive instances of substandard representation" by his counsel that were so serious that a new trial is *Page 10 
warranted. Mr. Sands specifically lists forty-three alleged instances where he was deprived of the effective assistance of counsel. We find his argument to be wholly without merit.
 {¶ 34} Mr. Sands' numerical list of forty-three alleged instances of ineffectiveness of counsel in his brief contains no case law to support his assertions. "It is axiomatic that the failure to cite case law or statutes in support of an argument, as required by App. R. 16(A)(7), constitutes grounds to disregard the assigned error pursuant to App. R. 12(A)(2)." (Citations omitted.) State v. White, 8th Dist. No. 82066,2004-Ohio-5200, ¶ 22. See, also, State v. Duncan, 11th Dist. No. 93-G-1794, 1994 Ohio App. LEXIS 2284. Thus, "[u]nder App. R. 12(A)(2), we could affirm on the basis that the appellant failed to provide support or argument for his assignment of error; however, in the interests of justice, we will address the assignment of error which was appealed."State v. Wise, 11th Dist. No. 96-L-168, 1997 Ohio App. LEXIS 3113, 6.
 {¶ 35} "`[W]hen a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness.' * * * The [Supreme Court of Ohio] recognized that there are `(* * *) countless ways to provide effective assistance in any given case.'" State v.Vinson, Jr., 11th Dist. No. 2006-L-238, 2007-Ohio-5199, ¶ 29, citingState v. Allen (Sept. 22, 2000), 11th Dist. No. 99-A-0050, 2000 Ohio App. LEXIS 4356, 10, citing State v. Bradley (1989), 42 Ohio St.3d 136,142, quoting Strickland v. Washington (1984), 466 U.S. 668, 687-689. "Therefore, the court stated "judicial scrutiny of counsel's performance must be highly deferential. (* * *)."'" Id. *Page 11 
 {¶ 36} "In addition, `because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. (* * *).' Id. Counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance." Id. (Parallel citations omitted.) Thus, "[t]o warrant reversal, `the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would be different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' * * *" Id. at ¶ 30, citing Allen at 10-11, citing Bradley at 142, quoting Strickland at 694.
 {¶ 37} "Further, `[t]his court concluded in State v. Rudge (Dec. 20, 1996), 11th Dist. No. 95-P-0055, 1996 Ohio App. LEXIS 5807, 12, that "[s]trategic and tactical decisions will not form the basis of a claim of ineffective assistance of counsel, even if there had been a better strategy available to him."' Thus, `[e]rrors of judgment regarding tactical matters do not substantiate a claim of ineffective assistance of counsel.'" Id. at ¶ 31, quoting Allen at 11. (Citations omitted.)
 {¶ 38} In claiming he was so ineffectively represented, Mr. Sands fails to allege one instance where his counsel actually fell below the requisite standard of care. Rather, a review of the list of forty-three alleged examples of ineffectiveness reveals these instances concern tactical or strategic decisions, or are blatantly wrong, in that counsel did object, or the example of sub-standard performance was inaccurately depicted. For the sake of clarity and in an attempt to concisely analyze this overly *Page 12 
exhaustive assignment of error, we will address Mr. Sands' "list" in summary fashion by combining and categorizing his alleged examples of ineffectiveness that relate to each other or concern the same type of issue.
 {¶ 39} At the outset, our review of the record reveals that defense counsel, the state, and the trial court acted in a most careful and conscientious manner throughout the trial in order to avoid error. Sidebars were frequent and almost all objections were discussed at sidebar. Moreover, key witnesses' expected testimony was discussed in detail in advance, and the trial court limited testimony as necessary. Thus, the case proceeded carefully and conscientiously.
 {¶ 40} Mr. Sands' counsel was not admonished so frequently as he would have us believe, but rather it was only on the fifth or sixth day of testimony that he was briefly admonished for asking the same questions repeatedly.
 {¶ 41} Pretrial Motions
 {¶ 42} Mr. Sands alleges three instances in regards to pretrial motions, but our review indicated there is no merit to these allegations.
 {¶ 43} First, the precise area of concern regarding the testimony of the state's expert, Mr. Dolence, was a proposed video of an explosion that was identified in the state's discovery responses. Inasmuch as the state indicated that Mr. Dolence would only show still photos of the bomb components, this issue became moot.
 {¶ 44} Second, the court did in fact grant the defense motion to prevent the introduction of Ms. Holin's post-arrest statements, and the court also limited the testimony of Mayor Williams' wife, Jennifer, to preclude the introduction of the mayor's cause of death per defense counsel's objection. *Page 13 
 {¶ 45} Finally, the court did rule before trial that the transcripts of the taped recordings would be given to the jury to follow as they heard the tape. In fact, throughout the trial both sides used these transcripts to assist not only the jury, but the witnesses during examination and, at the request of defense counsel, the jury was reminded repeatedly not to read ahead while the recording was played and the transcripts were removed from the jury after each session. Defense counsel repeatedly objected in the record to the use of these transcripts before and throughout trial.
 {¶ 46} Testimony as to the Veracity of the Informant
 {¶ 47} Mr. Sands points to testimony given by Detective Parisi relating to the information Mr. Green had given in the past. The detective's characterization of this past information as "good" can in no way, shape, or form be construed as opinion testimony regarding Mr. Green's veracity in this case. Indeed, Mr. Green was questioned upon cross-examination and the jury was made well aware of his criminal history.
 {¶ 48} Failure to Object and Seek Limiting Instructions as to "Impact"Testimony of Judge Cicconetti and Chief Mercsak
 {¶ 49} An element of Mr. Sands' defense was that he was a "storyteller" or braggart, and thus the threats he made on the recordings should not be taken seriously. The testimony by the judge that his children's grades slipped after being told of the threat; the analogy of planes overhead after 9/11 used to describe how the judge felt the following weeks after the incident whenever a car would pass by his home; and the chief's observation that the mayor's demeanor or reaction upon being advised of the threat that he was afraid, are all relevant to the issue of how seriously the threats were taken by the targets, including the targets' families who were also intended victims. *Page 14 
 {¶ 50} Mr. Sands fails to cite any grounds for objecting to these statements. We are left to guess what rule of evidence was ignored.
 {¶ 51} Admonishments for Failure to Make ContemporaneousObjections
 {¶ 52} A number of the claimed examples of sub-standard performance involve admonishments by the court for failure to make contemporaneous or appropriate objections or to pose questions rather than make statements. A review of each of these examples reveals that any such "admonishments" were made at side bar or were not "admonishments" at all. Further, Mr. Sands has failed to argue how he was prejudiced by the guidance given by the court.
 {¶ 53} "Armed Robbery" Complaint Referenced by Chief Mercsak
 {¶ 54} There was no such testimony by the witness. When asked when the complaints against the department began, Chief Mercsak testified that Mr. Sands' complaints started in 2003 after she had completed a theft report from the business. As she was questioned further, she did say the word "armed," but quickly corrected herself and described a "theft" charge. Given this incomplete and fleeting use of the word "armed" it is highly improbable that this made a difference in the jury's determination of Mr. Sands' guilt or innocence.
 {¶ 55} Use of Inaccurate Transcripts by the Jury
 {¶ 56} As noted in our discussion of the pretrial motions, the court did address defense counsel's concerns regarding the use of the transcripts of the taped recordings, specifically the concern that the jury would focus more on the transcript (as opposed to an inaccurate word or phrase) instead of listening carefully to determine for themselves what was said. *Page 15 
 {¶ 57} The court ruled that the transcripts would be given to the jury to follow as they heard the tape. In fact, as previously noted, throughout the trial both sides used these transcripts to assist not only the jury, but the witnesses during examination. Furthermore, at the request of defense counsel, the jury was reminded repeatedly not to read ahead while the recording was played, and the transcripts were removed from the jury after each session. The jury was also instructed that the recordings, not the transcripts, were evidence, and most importantly, the jury was instructed that they should rely on their own perceptions of what they heard and not upon what was typed in the transcript. Defense counsel objected to the transcripts repeatedly, and thus we are at a loss as to how his counsel was ineffective in his approach.
 {¶ 58} Chief Mercsak's Testimony as to the Response to ComplaintsFiled Against the Department
 {¶ 59} At this point in Chief Mercsak's testimony, the state was developing the background relationship between the department and Mr. Sands, which obviously is relevant to motive. Mr. Sands had filed formal complaints with the department about the conduct of its officers, and when asked what orders she issued regarding Mr. Sands and his business after the complaints were filed, Chief Mercsak testified that the officers were instructed to take back up officers who could witness any further interactions with Mr. Sands.
 {¶ 60} We fail to see the basis upon which one could object to this line of questioning, and Mr. Sands once again fails to give us the basis for an objection. Moreover, testimony which explains the actions of a witness to whom the statement was made, and is offered to show the witness acted in a particular manner rather than to *Page 16 
prove the truth of the matter asserted, is not hearsay. State v.Blevins (1987), 36 Ohio App.3d 147, 149.
 {¶ 61} As for the chief's statement that "it was obvious that he didn't care for us at all," which she testified was gleaned by her review of written statements of her officers, that testimony must be read in context with her testimony that "Mr. Sands told me that he didn't like my officers" that was made immediately before this observation. The statements are relevant to explain her conduct and that of her officers, and were not offered for the truth of the matter asserted. Therefore, they are not hearsay, if indeed, hearsay underlies this criticism. See State v. Williams (1996), 115 Ohio App.3d 24, 40.
 {¶ 62} Chief Merscak's Characterization of Mr. Sands' Complaints as"Frivolous"
 {¶ 63} Once again we are not provided with a basis for an objection Mr. Sands claims should have been made by defense counsel. The witness is certainly allowed to testify that she investigated the complaints and determined that many were baseless and were without merit.
 {¶ 64} Mr. Green's Observations as to Mr. Sands' Demeanor and ThreatMade Against Him After Mr. Sands' Arrest
 {¶ 65} Yet again, Mr. Sands fails to inform why Mr. Green's personal observations of the defendant's demeanor and tone of voice were objectionable and what prejudice resulted, if any, from defense counsel's failure to object. Such observations provide relevant evidence to support the witness' belief that this was not just another instance of Mr. Sands telling a "story." *Page 17 
 {¶ 66} While the testimony describing the threats made to Mr. Green after Mr. Sands' arrest do contain impermissible hearsay statements of the two individuals who Mr. Green claims made the threats, the failure to object in this instance is harmless as defense counsel made the point on cross-examination that Mr. Sands did not make those threats. Further, Mr. Sands fails to argue how this testimony affected the jury's determination of guilt or innocence.
 {¶ 67} Mr. Green's Notes
 {¶ 68} Mr. Sands' rendition of the side-bar discussions as to these notes is incorrect. It is clear that defense counsel requested production of the notes on two occasions and the court instructed the state to produce the "notes" if indeed they were in the possession of the state or its witness. There is nothing in this record to demonstrate that the notes were in the possession of the state or its witness, or were actually produced or introduced at trial.
 {¶ 69} Detective Doyle's Testimony
 {¶ 70} Mr. Sands asserts that defense counsel failed to object to three areas of testimony by Detective Doyle. The first area concerned the handwritten note setting out the targets' names and another handwritten note giving the directions to the gun store in Ashland. The second area concerned the testimony that Mr. Sands never abandoned his plan to conduct the bombings, and the third area related to the detective's prior dealings with Mr. Sands. These assertions are made without argument or identification of the basis for any objections nor the prejudicial effect of the testimony.
 {¶ 71} Apart from the testimony that the detective could identify the documents as being in Ms. Holin's hand, the balance of the testimony regarding these two *Page 18 
documents addressed chain of custody issues. The foundational questions could have been more precise, but a reading of the entire line of questioning of this witness reveals that the detective identified these notes as written by Ms. Holin based upon the information given to him by Mr. Green at the time Mr. Green presented the documents to him.
 {¶ 72} The detective's testimony that after he listened to the tape recordings he heard no indication that Mr. Sands had abandoned his plan is hardly objectionable.
 {¶ 73} Finally, the testimony relating to a prior incident with Mr. Sands was brought forth on cross-examination and actually underscored the point the defense was trying to make that Mr. Sands liked to talk and yell.
 {¶ 74} Special Agent Csaszar's Testimony
 {¶ 75} The agent was generally describing the nature of the FBI's involvement in this case when he testified on direct examination that he had received a phone call and "was told that people in the FBI headquarters in Washington D.C. felt that this was such a grave threat, that they wanted to have us provide surveillance on Mr. Sands and Ms. Holin 24 hours a day from the point starting right then and there until this thing was resolved."
 {¶ 76} Mr. Sands assets there "simply is no rule of evidence that would allow this testimony" but, actually, "[t]he courts of this state have generally held that testimony concerning the basis or reason for an officer's actions during an investigation is not considered hearsay."Williams at 40. As this court held in Williams, supra, "[t]he purpose of the testimony was not to prove the truth of the matter asserted, but merely to explain the mind-set of the officers * * *." Id. *Page 19 
 {¶ 77} Additionally, Mr. Sands asserts that since one of the defense theories was entrapment, the agent's testimony that he had no concerns that Mr. Green was behind this plot had the same effects as if he had given his opinion that the defendant was guilty. This testimony, however, was based upon Special Agent Csaszar's involvement in the case and his interaction with Mr. Green.
 {¶ 78} On cross-examination defense counsel questioned the agent as to his concerns regarding entrapment, and the agent was also questioned whether he had been made aware of Mr. Green's criminal history, to which he answered he was. The follow-up question by the state as to whether the agent did in fact have any concerns that Mr. Green was behind the plot was a legitimate question as it was clearly relevant to the entrapment issue. Quite simply, the detective was testifying as to his own personal concerns or lack thereof, and most fundamentally, he offered no opinions as to Mr. Sands' guilt.
 {¶ 79} Testimony of Special Agent Turner
 {¶ 80} There are four areas of concern to Mr. Sands relative to the testimony of ATF Special Agent Turner.
 {¶ 81} Mr. Sands' first assertion was that counsel failed to object to the agent's description of why he was tasked with surveillance duty at the Ashland gun store. His brief recitation of his understanding of the plot under investigation was not objectionable as it falls under the umbrella of the basis for the investigator's actions as explained inWilliams, supra. The "function of the jury" was not usurped through this description of the plot given to the agent so that he could understand why he had these two men under surveillance in a gun shop. *Page 20 
 {¶ 82} The same reasoning applies to the criticism that counsel "permitted" the agent to "reiterat[ed] his belief * * * that Appellant intended to make a pipe bomb."
 {¶ 83} This explosives expert's testimony that the general nature and use of pipe bombs is "antipersonnel in nature" in no way directly or inferentially implicated Mr. Sands, and is clearly relevant to the issue of whether the chosen instrumentality could cause the harm contemplated.
 {¶ 84} Finally, Mr. Sands is critical of two apparent tactical decisions made by defense during cross-examination. The first had to do with allowing this expert to further detail what was needed to construct an effective pipe bomb. It is clear from a reading of this entire line of cross-examination that defense counsel wanted the jury to infer that Mr. Sands did not have enough powder on hand to fill the entire pipe and that at the time of the arrest Mr. Sands did not have in his possession or control all of the components to construct this pipe bomb.
 {¶ 85} The second tactical decision was defense counsel's failure to challenge this expert's credentials in the area of homemade napalm inasmuch as the expert had never personally prepared napalm and that he had gleaned information regarding homemade napalm from the internet. This information, however, was made known to the jury during defense counsel's cross-examination.
 {¶ 86} Moreover, "[r]eviewing courts must not use hindsight to second-guess trial strategy, and must keep in mind that different trial counsel will often defend the same case in different manners." State v.Gregg, 11th Dist. No. 2006-A-0013, 2007-Ohio-1201, ¶ 53, quotingState v. McCaleb, 11th Dist. No. 2002-L-157, 2004-Ohio-5940, ¶ 111, quoting State v. Samatar, 152 Ohio App.3d 311, 2003-Ohio-1639, ¶ 88. Even if we did *Page 21 
find these tactical decisions to be dubious, which we do not, "errors of judgment regarding tactical matters do not substantiate a defendant's claim of ineffective assistance of counsel." Id.
 {¶ 87} Testimony of Special Agent Kolar
 {¶ 88} The first of five criticisms leveled against defense counsel during the examinations of Special Agent Kolar pertained to his testimony that Mr. Green informed him that "sometimes Joe was surveillance conscious" and thus, the FBI installed a GPS device on Mr. Green's minivan. Once again this would fall under the ambit ofWilliams, supra, as the basis for the investigator's actions.
 {¶ 89} The second criticism is not well-founded because defense counsel did in fact object to the opinion testimony regarding the seriousness of the threat.
 {¶ 90} The third criticism raised was that defense counsel failed to object to the witness summarizing the threats against the various victims. Without providing a basis and authority for this argument we can only surmise as to the grounds, but a reading of the testimony cannot be said to be prejudicial as the witness testified that "[a]s far as the police chief goes, I don't recall any specific mention of her on the recordings other than just being one of four targets that was originally brought to our attention from the initial debriefing of CI." Mr. Sands was found not guilty on the three counts as to the police chief.
 {¶ 91} The fourth criticism was that defense counsel failed to object when the witness "editorialized that Appellant lied." A fair reading of this line of questioning would be that the witness was merely comparing statements made by Mr. Sands to other evidence found in the investigation. There was absolutely no editorialization. *Page 22 
 {¶ 92} The fifth and final criticism lodged against defense counsel was that defense counsel asked the witness to describe Mr. Sands' motivation. This line of questioning was apparently designed by defense counsel to set the foundation from which to challenge the grounds set forth in this witness' earlier affidavit. This falls squarely within the area of trial strategy. As previously noted, "[t]here is a strong presumption that counsel's conduct falls within a reasonable legal strategy." State v. Gau, 11th Dist. No. 2005-A-0082, 2006-Ohio-6531, ¶ 35, citing Strickland at 689. Thus, "[d]ecisions on strategy and trial tactics are generally granted a wide latitude of professional judgment." Id. "It is not the duty of a reviewing court to analyze the trial counsel's legal tactics and maneuvers." Id.
 {¶ 93} As in Gau, supra, the failure of defense counsel to object to the questions described above did not fall below an objective standard of reasonableness. Id. at ¶ 44. Even if we did find defense counsel's failure to object unreasonable, it was not prejudicial as there was more than enough evidence in this case to support Mr. Sands' convictions.
 {¶ 94} Objection to the Use of Mr. Sands' Post-Arrest Statement
 {¶ 95} A review of the taped post-arrest statement demonstrates that the defense attorney most likely withdrew the motion to suppress because there was nothing to suppress. Mr. Sands clearly understood the rights waiver explained to him both before and after the statement, clearly consented to the searches, seemingly inviting them to search because he had nothing to hide, as he stated, "come and look. . .I have nothing to hide." Further, he made no incriminating statements or admissions during this post-arrest interview. The failure to object to this evidence may also have been a trial tactic *Page 23 
to allow the jury to hear Mr. Sands' explanations of why he had the materials at his home and residence for the second time.
 {¶ 96} Testimony of Ralph Dolence
 {¶ 97} Mr. Sands cited seven instances of substandard performance by his trial counsel during the presentation of another explosives expert, Mr. Dolence. The first criticism centered on his failure to challenge Mr. Dolence's qualifications under Daubert v. Merrell DowPharmaceuticals, Inc. (1993), 509 U.S. 579. The basis of this criticism appears to be that had defense counsel challenged the expert's qualifications or methods, this testimony would have been excluded. Such a speculative argument must be viewed in the context of how this court reviews decisions made by the trial court regarding admissibility of expert testimony.
 {¶ 98} "A determination as to the admissibility of an expert's testimony is a matter that is generally within the discretion of a trial judge and will not be disturbed absence an abuse of discretion; however, that discretion is not unlimited." Slaby v. Boyle (June 18, 1999), 11th Dist. No. 97-A-0086, 1999 Ohio App. 2807, 9, citing Miller v. BikeAthletic Co. (1998), 80 Ohio St.3d 607, 616.
 {¶ 99} Pursuant to Evid. R. 702, a witness may testify as an expert if:
 {¶ 100} "(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
 {¶ 101} "(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony; *Page 24 
 {¶ 102} "(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:
 {¶ 103} "(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;
 {¶ 104} "(2) The design of the procedure, test, or experiment reliably implements the theory;
 {¶ 105} "(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result."
 {¶ 106} Once the record demonstrates that the subject of the expert's testimony relates to matters beyond the knowledge or experience of lay persons (explosives certainly meets that definition); that the expert has special skills or knowledge to evaluate facts not generally possessed by lay persons (Mr. Dolence's credentials as an expert were established); and that the witness' testimony is based upon reliable scientific or technical information (Mr. Dolence gave the technical basis for his opinions); the expert's opinion testimony is admissible.
 {¶ 107} The proper foundation was laid by the state prior to Mr. Dolence's testimony as an expert. Specifically, Mr. Dolence testified as to his extensive professional history as a licensed registered fire cause origin investigation agent and instructor for the ATF, as well as the fact that he had been qualified as an expert witness in three states, including Ohio. *Page 25 
 {¶ 108} A decision to raise a Daubert challenge falls within the rubric of trial strategy, and faced with this witness' credentials, it cannot be said that the decision to not so challenge was facially wrong. There is nothing in the record to support an argument that had such a challenge been made, Mr. Dolence would have been excluded as an expert witness.
 {¶ 109} A second criticism is that defense counsel failed to object to cumulative testimony. Mr. Sands claims that Mr. Dolence's testimony was "essentially identical" to that of Special Agent Turner and that counsel made no effort to limit "duplicative, irrelevant and incompetent" testimony.
 {¶ 110} Firstly, immediately before trial, a motion in limine seeking the exclusion, or in the alternative, limitation of this witness' testimony, was raised and argued by defense counsel.
 {¶ 111} Secondly, a review of the two witnesses' testimony demonstrates that Mr. Dolence's testimony went into much greater detail and covered additional areas not covered by Special Agent Turner, specifically the properties of ether and its effect when employed in the construction of a pipe bomb, clearly relevant information to an attempted arson charge.
 {¶ 112} Evid. R. 403(B) gives the trial court the discretion to exclude evidence if its probative value is substantially outweighed by consideration of undue delay or needless presentation of cumulative evidence. As Professor Giannelli notes, "[t]he rule does not prohibit the introduction of cumulative evidence — only the `needless' presentation of such evidence. `Certainly a trial court has no authority to unreasonably restrict the right of a party to offer additional testimony, even though the same may be cumulative.'" *Page 26 
Giannelli Snyder, Evidence (2 Ed. 2001) 403.8, citing Borschewski v.State (1920), 13 Ohio App.362, 365.
 {¶ 113} Given this witness' further credentials as an arson investigator and the additional information brought out in his testimony, it cannot be said that had an Evid. R. 403(B) objection been raised that it would have been granted.
 {¶ 114} A third criticism focused on the witness' use of a Power Point presentation and defense counsel's failure to make a contemporaneous objection as to its use. As noted earlier, the concern raised prior to trial related to the state's proposal to use a video of an explosion during the testimony of this witness. No video tape was created or used; thus, this argument has no merit.
 {¶ 115} The fourth and fifth criticisms related to a failure to object to Mr. Dolence's "specula[tion] upon methods of constructing a pipe bomb, and upon methods of making pipe bombs more lethal," and that he was permitted to offer opinions that ether, used with a pipe bomb, "would take out the house" and that once a pipe bomb is detonated "you will kill everyone."
 {¶ 116} While Mr. Sands fails to cite what precise testimony would have been ruled inadmissible as speculative had an objection been interposed, our reading of the testimony reveals that this expert did not engage in speculation. Rather, Mr. Dolence testified that he examined the physical evidence that was collected and observed the photographs. Thus, based upon these facts in evidence and his expertise, he offered a permissible opinion that "[t]here were several ways you could make a pipe bomb with the components that were found." This testimony is clearly relevant to the issues of plan, intent, and opportunity. *Page 27 
 {¶ 117} In regard to the criticism relating to this witness' testimony as to the increased lethality and capability of the pipe bomb to "take out the house," pursuant to Evid. R. 705, an "expert may testify in terms of opinion or inference and give his reasons therefore after disclosure of the underlying facts or data. The disclosure may be in response to a hypothetical question * * *."
 {¶ 118} The state posed hypothetical questions, which contained certain facts that had been admitted into evidence. Mr. Dolence offered his permissible opinion that four cans of ether attached to a pipe bomb "would take out the house." He was further asked what would occur when a two-inch pipe, cut and filled with gunpowder, to which was attached a can of ether, was thrown through a window of a residence. He opined that such a device would "[n]ot only blow up causing structural damage into the house" but that it would also be a "nasty antipersonnel device * * * After you would throw that through the window, assuming I was asleep, my family was [a]sleep, you would hear broken glass, at that point the fuse would light the powder, deflagration would occur, simultaneously ignite the ether can and you would kill everyone that was in close proximity to that."
 {¶ 119} Such permissible expert opinion testimony was relevant to both the attempted arson and the attempted murder charges in order to establish that the planned device was capable of producing this degree of harm.
 {¶ 120} A sixth criticism pertained to a failure to object to the use of slides depicting an exemplar pipe bomb and its detonation. The admission of experimental or demonstrative evidence is within the discretion of the trial court. State v. Jackson (1993),86 Ohio App.3d 568, 570 (citations omitted). Demonstrative evidence when *Page 28 
"used to illustrate and explain testimony may be admissible if they are substantially accurate representations of what the witness is endeavoring to describe." Giannelli at 901.20, citing McCormick, Evidence (5th ed. 1999) 213. In State v. Palmer (1997), 80 Ohio St. 543, the Supreme Court of Ohio held that it was not an abuse of discretion for a trial court to permit the use of a .22 caliber weapon as a demonstrative exhibit when it was made clear to the jury that this exhibit was not the murder weapon. Id. at 566.
 {¶ 121} Evid. R. 401 and 901 govern the use and admissibility of demonstrative evidence, and in this case, the slides were properly authenticated by the witness and relevant to questions of plan, intent, and opportunity.
 {¶ 122} Furthermore, the slides depicting an exemplar pipe bomb and its detonation were not admitted as exhibits. The witness repeatedly told the jury that certain slides were "exemplars" and that he did not want to "mislead, these were not at the scene." Moreover, the extensive cross-examination of this witness as to any dissimilarities reinforced the distinctions. Thus, the record does not establish any prejudicial effect of the use of these slides.
 {¶ 123} A seventh and final criticism is that although defense counsel's objection to testimony as to an assumption that starter fluid was present at the shop was sustained, defense counsel "seemed unable to recognize that a scientist who makes assumptions without evidence has no credibility." We find it difficult to even surmise the point of this criticism, and Mr. Sands fails to articulate grounds or prejudice, but we do note that the record does demonstrate that defense counsel extensively cross-examined the witness in an attempt to undermine the witnesses' credibility.
 {¶ 124} Testimony that Mayor Williams Began to Keep a Weapon at Homeand Other Observations by the Mayor's Wife *Page 29 
 {¶ 125} This criticism focuses on testimony offered by the mayor's wife that she observed that her husband began keeping a weapon in the home; that a security system was installed after the threat was made known to the mayor and his family; that she observed tears in the mayor's eyes when she was informed that the family would have to leave their home; and that she observed that the mayor changed for the worse after the threat. Mr. Sands asserts that defense counsel failed to make contemporaneous objections to this testimony and failed to preserve the issue of "victim impact testimony" for appeal.
 {¶ 126} This line of questioning was discussed at side bar in advance of the presentation of this witness. Rulings and limitations of the testimony were made on the record, thereby preserving this question for appeal, as will be discussed in our analysis of Mr. Sands' sixth assignment of error. Thus, defense counsel properly objected before this witness was even presented to the jury.
 {¶ 127} Use of the Bailiff to Play State's Exhibit 75
 {¶ 128} During the jury instructions the court advised that should the jury wish to hear the recording of Mr. Sands, marked as State's Exhibit 75, the court bailiff would have to play the recording, not a jury member. This was done to ensure the jury would not hear Mr. Sands speak of going to a crack house in Cleveland where he shot seven or eight people. We fail to see how defense counsel was deficient in his performance by not objecting to this procedure designed to assure that prejudicial statements would not reach the jury. The record gives no indication that the court bailiff would be in the room during deliberations.
 {¶ 129} Entrapment Instruction *Page 30 
 {¶ 130} This criticism is quite perplexing inasmuch as defense counsel is being faulted for failing to object to an instruction that could actually help his client. Further, Mr. Sands fails to identify the prejudice caused by this instruction. Thus, this argument is wholly without merit.
 {¶ 131} Quite simply, nothing Mr. Sands alleges in his "list" rises to the level of ineffective assistance of counsel, and thus we fail to even reach the prejudice prong of the test outlined in Strickland. Mr. Sands has failed to establish that any of these instances, whether taken singly or cumulatively, deprived him of the effective assistance of counsel and that but for these errors, the result of trial would be otherwise. There is more than enough evidence that Mr. Sands committed these crimes, and there is no proof that a reasonable probability exists that the outcome would have been different.
 {¶ 132} It bears repeating that "[d]ecisions on strategy and trial tactics are generally granted a wide latitude of professional judgment."Gau at ¶ 35, citing Strickland at 689. "It is not the duty of a reviewing court to analyze the trial counsel's legal tactics and maneuvers." Id.
 {¶ 133} "In United States v. Hastings (1983), 461 U.S. 499, 508-509, the Supreme Court of the United States observed that `given the myriad safeguards provided to assure a fair trial, and taking into account the reality of the human fallibility of the participant, there can be no such thing as an error-free, perfect trial, and * * * the Constitution does not guarantee such a trial.'" State v. Scarl, 11th Dist. No. 2002-P-0091, 2003-Ohio-3493, ¶ 75.
 {¶ 134} None of the forty-three listed alleged examples of ineffectiveness have any merit. Indeed, our review of the record reveals that defense counsel proceeded *Page 31 
conscientiously and carefully throughout the trial. Even if we did find one of the alleged forty-three instances of ineffectiveness to have merit, there is no evidence that but for defense counsel's error, the result of the trial would have been different as the evidence overwhelmingly supports a finding of guilt.
 {¶ 135} Mr. Sands' first assignment of error is without merit.
 {¶ 136} Insufficiency of the Evidence as to RICO
 {¶ 137} Mr. Sands argues in his second assignment of error that the evidence is insufficient to sustain his conviction for one count of engaging in a pattern of corrupt activity because he was sentenced for only one conspiracy. We find this argument to be wholly without merit, as the state offered sufficient evidence that Mr. Sands was conspiring to engage in multiple predicate offenses.
 {¶ 138} "In State v. Schlee (Dec. 23, 1994), 11th Dist. No. 93-L-082, 1994 Ohio App. LEXIS 5862, we clarified the distinction between a manifest weight and sufficiency challenge. In Schlee, we held that `"[s]ufficiency" challenges whether the prosecution has presented evidence on each element of the offense to allow the matter to go to the jury, while "manifest weight" contests the believability of the evidence presented.'" State v. Egli, 11th Dist. No. 2007-P-0052, 2008-Ohio-2507, ¶ 33, citing Schlee at 13. "Thus, the standard to be applied in a sufficiency of the evidence challenge is `when viewing the evidence in a light most favorable to the prosecution,' * * * [a] reviewing court [should] not reverse a jury verdict where there is substantial evidence upon which the jury could reasonably conclude that all of the elements of an offense have been proved beyond a reasonable doubt. Id., citingState v. Eley (1978), 56 Ohio St.2d 169, syllabus." Id., quotingState v. Miliner, 11th Dist. No. 2007-T-0031, 2007-Ohio-6561, ¶ 17. "Therefore *Page 32 
a sufficiency challenge requires us to review the record to determine whether the state presented evidence on each of the elements of the offenses presented." Id.
 {¶ 139} While Mr. Sands is challenging the sufficiency of the evidence as to a pattern of engaging in corrupting activity, he is actually making a legal argument that he cannot be convicted of one conspiracy and be found guilty of engaging in a pattern of corrupt activity at the same time. Mr. Sands fails to realize that while he was sentenced on only one count of conspiracy, he was convicted of conspiracy for five predicate offenses. Specifically, the state introduced sufficient evidence of conspiracy to commit the aggravated murder of Mayor Williams, Judge Cicconetti, and Prosecutor Gurley, and that Mr. Sands conspired to commit aggravated arson against both Mayor Williams and his property.
 {¶ 140} Pursuant to R.C. 2923.32(A)(1), Engaging in a pattern of corrupt activity, "[n]o person * * * associated * * * with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity."
 {¶ 141} Further, R.C. 2923.31(E) defines a "pattern of corrupt activity" as "two or more incidents of corrupt activity, whether or not there has been a prior conviction, that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event."
 {¶ 142} There was ample evidence that Mr. Sands intended to construct pipe bombs, throw them into these three victims' homes, and further, "shoot the head off of Judge Cicconetti." From the many recordings of Mr. Sands' own discussions with Mr. Green, Mr. Sands intended to kill Mayor Williams first, before his sentencing on April 20, *Page 33 
Mr. Gurley would be killed by a month later, and then depending on the circumstances, it might take "over a year" to shoot the judge. The evidence gathered included all the equipment necessary to make multiple pipe bombs, loaded with shrapnel and ether, as well as an extremely large quantity of various ammunition, handguns, shotguns, and rifles. A "dry run" was conducted on Mayor Williams' home where Mr. Sands planned to run out of a vehicle and throw a pipe bomb through Mayor Williams' bay window. There was a handwritten note with the intended targets' names and addresses, and numerous recorded conversations in which Mr. Sands detailed the plans. Thus, the state introduced more than sufficient evidence to support Mr. Sands' convictions for the multiple predicate offenses of the conspiracy to commit the aggregate murder of three victims, and conspiracy to commit aggravated arson against Mayor Williams and his property.
 {¶ 143} Mr. Sands was ultimately sentenced for one conspiracy, because for purposes of sentencing, there was one overall conspiracy to commit several predicate offenses. Thus, R.C. 2923.01(F), states: "A person who conspires to commit more than one offense is guilty of one conspiracy, when the offenses are the object of the same agreement or continuous conspiratorial relationship."
 {¶ 144} Mr. Sands, however, was convicted of conspiracy to commit aggravated murder on three counts, one for each victim, and two counts of aggravated arson, one for Mayor Williams, and the second for his property. Thus, he was convicted for conspiring to commit five predicate offenses. The evidence was surely sufficient in this case to support Mr. Sands' conviction for engaging in a pattern of corrupt activity since he was attempting to commit five crimes. *Page 34 
 {¶ 145} Mr. Sands' second assignment of error is without merit.
 {¶ 146} Improper Application of RICO
 {¶ 147} In his third assignment of error, Mr. Sands contends that he committed no offense that is prohibited by R.C. 2923.32, because this statute prohibiting engaging in a pattern of corrupt activity is meant solely to prohibit organized crime. Specifically, he argues that he was not part of an "enterprise" as defined under the statute. We find this argument is wholly without merit.
 {¶ 148} We addressed this same argument in State v. Gregg, 11th Dist. No. 2006-A-0013, 2007-Ohio-1201, where we reviewed that "R.C. 2923.31(C) defines "enterprise" for the purposes of R.C. 2923.32 as including"any individual, * * * or group of persons associated in fact although nota legal entity," including "illicit as well as licit enterprises." Thus, we stated, "[a]s is plain from the terms of the statute, `the legislature defined this term broadly to encompass even a single individual,'" and thus, there is no requirement that "an enterprise must be a formal, structured organization * * *." Id. at ¶ 29, citing State v.Habash (Jan. 31, 1996), 9th Dist. No. 17071, 1996 Ohio App. LEXIS 281, 14.
 {¶ 149} Indeed, the RICO statute itself provides that a person may be convicted of violating the provisions of R.C. 2923.32 as well as a conspiracy to violate one or more of those provisions under 2923.01 of the Revised Code. R.C. 2923.32(B)(1).
 {¶ 150} This was not a situation of "merely committing related crimes." This was a cohesive plan to murder three public officials by way of arson and guns. There are multiple predicate offenses that were to take place by first fire-bombing Mayor Williams' home, then killing Prosecutor Gurley approximately one month later, and then finally shooting Judge Cicconetti within the year. *Page 35 
 {¶ 151} As we noted in State v. Elersic (Nov. 21, 2001), 11th Dist. Nos. 2000-L-062 and 2000-L-164, 2001 Ohio App. LEXIS 5210, "an enterprise may certainly be comprised of only two individuals, particularly given that the statute includes one individual within the scope of an enterprise." Id. at 16, quoting State v. Grim (1995),102 Ohio App.3d 356, 358.
 {¶ 152} The RICO statute clearly provides that sufficient evidence of a pattern of corrupt activity will be adduced if the state introduces evidence which could show that Mr. Sands, either by himself, or in concert with others, such as Ms. Holin, engaged in a pattern of activity consisting of two or more independent acts. In this case, Mr. Sands was convicted of five predicate offenses.
 {¶ 153} Mr. Sands' third assignment of error is without merit.
 {¶ 154} Evidence of Other Acts
 {¶ 155} In his fourth assignment of error, Mr. Sands contends that the trial court abused its discretion in permitting the state to cross-examine him on other acts that he introduced by way of his direct examination. Specifically, Mr. Sands argues that the trial court erred in allowing the state to question him on an incident in which he forced his thirteen-year old son to file a false police report. Because of the ensuing charge, Mr. Sands worked as a confidential informant with Mr. Green on a drug case. We find this argument to be without merit.
 {¶ 156} "The determination to admit or exclude evidence is within the sound discretion of the trial court and will not be reversed by an appellate court absent a showing of an abuse of discretion."Vinson at ¶ 48, citing State v. Sledge, 11th Dist. No. 2001-T-0123, 2003-Ohio-4100, ¶ 20, citing State v. Rootes (Mar. 23, 2001), 11th Dist. *Page 36 
No. 2000-P-0003, 2001 Ohio App. LEXIS 1391, 4-5, citing Renfro v.Black (1990), 52 Ohio St.3d 27, 32. Abuse of discretion connotes more than error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. Id., citing State v.Montgomery (1991), 61 Ohio St.3d 410, 413, quoting State v. Adams
(1980), 62 Ohio St.2d 151, 157.
 {¶ 157} Mr. Sands argues that the essence of the "false charge" testimony implied he was dishonest; thus this was so prejudicial it denied him a fair trial. A review of the record, however, reveals otherwise. The court allowed a limited cross-examination after his counsel objected, specifically because Mr. Sands testified on direct examination that he and Mr. Green were informants for the police in the drug case. Mr. Sands' defense was that Mr. Green was the mastermind behind this conspiracy and that he was set up. Thus, he opened the door as to this line of questioning. The trial court then gave a limiting instruction to the jury before deliberations cautioning that such testimony could be used only to determine Mr. Sands' credibility.
 {¶ 158} Evid. R. 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."
 {¶ 159} Furthermore, evidence that is relevant is generally admissible, subject to certain exclusions, and irrelevant evidence is generally inadmissible. State v. Cortner, 11th Dist. No. 2005-T-0020,2006-Ohio-871, ¶ 24 citing Evid. R. 402.
 {¶ 160} Moreover, Evid. R. 403(A) governs one of the circumstances under which the exclusion of relevant evidence is made mandatory. Id. at ¶ 25, citing State v. Hamilton, 11th Dist. No. 2000-L-003, 2002-Ohio-1681, ¶ 81. "The rule states that the *Page 37 
trial court is required to exclude otherwise relevant evidence in cases where the probative value of the evidence is `substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.'" Id., quoting State v. Totarella, 11th Dist. No. 2002-L-147, 2004-Ohio-1175, ¶ 34; State v. Entze, 11th Dist. No. 2003-P-0018, 2004 Ohio 5321, ¶ 28.
 {¶ 161} Pursuant to Evid. R. 609 impeachment by evidence of a conviction of a prior crime may be used to attack the credibility of a witness when:
 {¶ 162} "(A)(3) Notwithstanding Evid. R. 403(A), but subject to Evid. R. 403(B), evidence that any witness, including an accused, has been convicted of a crime is admissible if the crime involved dishonesty orfalse statement, regardless of the punishment and whether based upon state or federal statute or local ordinance." (Emphasis added.)
 {¶ 163} Furthermore, "[a]ny time an accused testifies, the accused's prior conviction is admissible, unless the probative value of the evidence is outweighed by its prejudicial effect." Cortner at ¶ 32, citing State v. Lane (1997), 118 Ohio App.3d 230, 234. Thus, "Evid. R. 609(A)(2) specifically permits the State the ability to conduct a limited cross-examination for the purposes of impeachment." Id., citingState v. Bryan, 101 Ohio St.3d 272, 2004-Ohio-971, ¶ 132; State v.Green (1993), 66 Ohio St.3d 141, 147, 1993 Ohio 26, see, also, State v.Slagle (1992), 65 Ohio St.3d 597, 605, citing Evid. R. 611(B) ("As a general rule cross-examination is `permitted on all relevant matters and matters affecting credibility.'") "The extent of cross-examination allowed is within the discretion of the trial court, and will not be overturned absent an abuse of that discretion." Id., citing State v.Acre (1983), 6 Ohio St.3d 140, 145. *Page 38 
 {¶ 164} The state was allowed to cross-examine Mr. Sands on this issue because he testified as to it on direct. This relevant testimony certainly goes to the issue of Mr. Sands' credibility because he claimed Mr. Green was the mastermind in this current plot, and that they had been "snitches" in the past. As to the past incident, however, the state's cross-examination elicited only that Mr. Sands had been facing charges at that time, that Mr. Green had arranged for them to be confidential informants in an effort to help the police and Mr. Sands, and that in exchange, the charges against Mr. Sands were dropped.
 {¶ 165} Even if we did find this testimony was allowed in error, which we do not, the error would be harmless as "there is no reasonable possibility that exclusion of the evidence would have affected the result of this trial." State v. Boyle, 11th Dist. Nos. 2003-P-0027, 2003-P-0028, and 2003-P-0029, 2004-Ohio-1531, ¶ 27, citing State v.Webb, 70 Ohio St.3d 325, 335 ("nonconstitutional error is harmless if there is substantial other evidence to support the guilty verdict") (citations omitted.)
 {¶ 166} This testimony was not so prejudicial as to confuse the jurors. Furthermore, Mr. Sands himself opened the door to this testimony. We do not find an abuse of discretion in permitting this limited cross-examination, or the trial court's giving a limiting instruction as to its use before jury deliberations began.
 {¶ 167} Mr. Sands' fourth assignment of error is without merit.
 {¶ 168} Silence After Arrest
 {¶ 169} In his fifth assignment of error, Mr. Sands argues that he was penalized for his silence following his arrest in violation of his Fifth
and Sixth amendment rights of the United States Constitution. Specifically, Mr. Sands contends that the state created *Page 39 
the impression that he had an obligation to provide certain information to the arresting agents following his arrest. Because Mr. Sands waived his right to silence after he was mirandized and gave the police false information, we do not find that permitting the state's cross-examination as to these facts was error.
 {¶ 170} There is no question that any comment by the state during trial on post-arrest silence is violative of the Fifth Amendment to the United States Constitution. "The use for impeachment purposes of a defendant's post-arrest silence, after receiving Miranda warnings violates the Fifth Amendment right against self-incrimination as applied to the states through the Due Process Clause of theFourteenth Amendment." State v. Brown (May 1, 1991), 9th Dist. Nos. 90CA004836 and 90CA004838, 1991 Ohio App. LEXIS 2010, 8.
 {¶ 171} In this case, however, Mr. Sands waived his right to silence, and made a false statement to the police. When asked by the state about this statement that contradicted his defense, he admitted that he lied, and further conceded that he never mentioned Mr. Green as the alleged mastermind.
 {¶ 172} Specifically, Mr. Sands contends that the following exchange violated his right to remain silent after arrest:
 {¶ 173} "The State: And at no time when you spoke to the federal authorities did you ever say, `Hey, I am glad you guys are here because this guy, [Mr. Green], has this crazy plot to murder the Mayor of North Perry Village, to kill Judge Cicconetti, to kill Prosecutor Joe Gurley and to kill Police Chief Denise Mercsak,' you never told them that?"
 {¶ 174} "Mr. Sands: No." *Page 40 
 {¶ 175} The state was allowed to pose this question because Mr. Sands' defense was that Mr. Green instigated the conspiracy and that Mr. Sands merely played along to stop him. Thus, this testimony rebutted the defense's theory and was used by the prosecution to expose the weakness of his position.
 {¶ 176} Preceding this question was a line of questioning as to his statement to the police post-arrest. Mr. Sands admitted that he lied to the police at that time, telling them that he purchased the pipe for plumbing, that he purchased the gunpowder for reloading shotgun shells, although those types of shells were never found, and that he drove over one hundred miles to buy fifteen feet of wick to kill "varmints." The state clarified that Mr. Sands had no idea he was being recorded, and then asked if at any time he told the authorities Mr. Green was really behind the conspiracy plot to kill four public officials. At which point, Mr. Sands replied, "no."
 {¶ 177} We fail to see how this is violative of his Fifth andSixth Amendment rights, and it was properly used to impeach his attempted defense.
 {¶ 178} Mr. Sands' fifth assignment of error is without merit.
 {¶ 179} Victim-Impact Testimony During the Guilt Phase of Trial
 {¶ 180} In his sixth assignment of error, Mr. Sands argues that the testimony of Judge Cicconetti and Mayor Williams' wife regarding their fear upon hearing of the conspiracy plot to kill them was so prejudicial that he was denied a fair trial. Specifically, he argues that this testimony is not relevant evidence pursuant to Evid. R. 401, and that even if it was, it was highly inflammatory and evoked the jury's sympathy for the victims. We find this argument to be without merit. *Page 41 
 {¶ 181} As previously explained, "[t]he determination to admit or exclude evidence is within the sound discretion of the trial court and will not be reversed by an appellate court absent a showing of an abuse of discretion." Vinson at ¶ 48, citing Sledge at ¶ 20, citingRootes at 4-5, citing Renfro at 32. Abuse of discretion connotes more than error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. Id., citingMontgomery at 413, quoting Adams at 157.
 {¶ 182} Specifically, Mr. Sands takes issue with Judge Cicconetti's testimony as to the effect the murder threat had on his family, and that they fled their home the week before Mr. Sands' arrest due to their fear of being murdered. Judge Cicconetti further testified as to the effects on his family in that he himself could not work for several weeks after, and that one of his sons became particularly withdrawn and his grades slipped. Defense counsel did not object to this testimony, and we do not find that this testimony was so prejudicial that it rises to the level of plain error. Rather, this is merely evidence that the threat was taken seriously. Even if it is highly emotive, it is not so prejudicial that but for this testimony, the result would have been otherwise.
 {¶ 183} "Crim. R. 52(B) provides that `plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.' For Crim. R. 52(B) to apply, a reviewing court must find (1) that there was an error, i.e., a deviation from a legal rule; (2) that the error was plain, i.e., an `obvious' defect in the trial proceedings; and (3) that the error affected `substantial rights,' i.e., affected the outcome of the trial."Boyle at ¶ 31, citing State v. Barnes, 94 Ohio St.3d 21, 27,2002-Ohio-68 (citations omitted). *Page 42 
 {¶ 184} In the case of Mayor Williams' wife testimony, prior to her taking the stand, defense counsel objected at a sidebar conference. The court limited the examination, allowing testimony only as to how her fear prompted her to take action to protect herself and her family. The point being that the threat was considered serious and credible. Thus, she was allowed to testify in a limited manner that Mayor Williams kept a gun in their home after hearing of the threat, and that they moved out of their home, staying with family and friends until Mr. Sands and Ms. Holin were arrested. The testimony was relevant to the "seriousness of the threat" question, and balancing relevance with any prejudicial effect, we cannot say that it was so prejudicial or confusing to the jury that the trial court abused its discretion in permitting it. Even if we did, it is not so prejudicial that the outcome of trial would be affected as there is more than evidence of Mr. Sands' guilt.
 {¶ 185} Mr. Sands' sixth assignment of error is without merit.
 {¶ 186} Conspiracy and Engaging in a Pattern of Corrupt Activity asOffenses of Allied Import
 {¶ 187} In his seventh assignment of error, Mr. Sands contends that the merged conspiracy convictions and the RICO conviction are allied offenses of similar import pursuant to R.C. 2941.25. Mr. Sands argues that these are allied offenses because without the predicate offenses, there is no RICO violation. We find this argument to be without merit.
 {¶ 188} R.C. 2941.25 provides:
 {¶ 189} "(A) Where the same conduct by the defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information *Page 43 
may contain counts for all such offenses, but the defendant may be convicted of only one.
 {¶ 190} "(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all them."
 {¶ 191} Further, "R.C. 2923.32(B)(1) states in pertinent part: `Notwithstanding any other provision of law, a person may be convicted of violating the provisions of R.C. 2923.32 as well as of a conspiracy to violate one or more those provisions under R.C. 2923.01.'" State v.Yeager (Sept. 6, 2000), 9th Dist. No. 19593, 2000 Ohio App. LEXIS 3989, 24-25. In State v. Wilson (1996), 113 Ohio App.3d 737, the Ninth District addressed this very issue, saying that "in the case of the offenses of engaging in a pattern of corrupt activity and conspiracy to engage in a pattern of corrupt activity, the General Assembly has specifically provided for separate punishments for those crimes." Id. at 25, citing Wilson at 748.
 {¶ 192} Thus, by the very virtue of R.C. 2923.32(B)(1), Mr. Sands' offenses of engaging in a pattern of corrupt activity and conspiracy are not allied offenses of similar import under R.C. 2941.25. While Mr. Sands could not have been convicted for engaging in a pattern of corrupt activity if he was not convicted on multiple counts of conspiring to commit aggravated murder and aggravated arson, he could commit conspiracy without being convicted of engaging in a pattern of corrupt activity. Although there was one overall conspiracy, there were three intended victims, and they were to *Page 44 
be either shot or killed by arson. Thus, it is these multiple predicate offenses that support the charge of engaging in a pattern of corrupt activity.
 {¶ 193} Moreover, the elements of the statute have to be so similar that one crime cannot be committed without committing the other. From a plain reading of the statutes, one can see that they are not so similar. Indeed, if conspiracy of engaging in a pattern of corrupt activity and engaging in a pattern of corrupt activity have been determined not to be allied offenses, then we fail to see how it could even be argued that conspiracy to commit aggravated murder and aggravated arson could be akin to engaging in a pattern of corrupt activity, thus warranting an allied offenses of similar import analysis. See State v. Petty (Sept. 6, 2000), 9th Dist. No. 19611, 2000 Ohio App. LEXIS 3988, 29 ("By virtue of R.C. 2923.32(B)(1), Defendant's convictions are not allied offenses of similar import under R.C. 2941.25. As such, the trial court did not err by permitting Defendant to be convicted of and sentenced for both offenses"); see, also, Yeager at 25, State v. Sanchez (June 9, 1994), 8th Dist. No. 62797, 1994 Ohio App. LEXIS 2502, 21-22; State v.Conley (July 15, 1991), 12th Dist. No. CA90-11-023, 1991 Ohio App. LEXIS 3343, 11-12.
 {¶ 194} Mr. Sands' seventh assignment of error is without merit.
 {¶ 195} The judgment of the Lake County Court of Common Pleas is affirmed.
DIANE V. GRENDELL, P.J., concurs in judgment only,
 COLLEEN MARY O'TOOLE, J., concurs in judgment only. *Page 1